James Robert HOGGE et al.

v.

Wilmer J. HEDRICK et al.

Civ. A. No. 74–0488–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 29, 1974.

On Motion to Partially Vacate
Jan. 14, 1975.

94

Michael Morchower, Ott, Morchower, Thompson & McMullan, Richmond, Va., for plaintiffs.

William G. Broaddus, County Atty., Timothy Oakman, Asst. County Atty., County of Henrico, Richmond, Va., for defendants.

R. Michael Smith, Norfolk, Va., for intervening plaintiff.

## MEMORANDUM

MERHIGE, District Judge.

This action, under 42 U.S.C. § 1983 and the First, Fourth, Ninth and Fourteenth Amendments to the Constitution, challenging the validity of Chapter 17, Articles I–IX, of the Code of the County of Henrico, Virginia, which regulates the operation of and the conduct of employees at massage parlors located within the county, is before the Court on plaintiffs' motion for a preliminary injunction. Plaintiffs, whose places of business are located within the County of Henrico, are James R. Hogge and Jackie C. Easterling, part-owners of Hide-A-Way Health Club; Elmo E. Selph, President of E.S.V., Inc., a Virginia corporation which operates Atlantis Massage; Elisha Porter, III, President of Tri-City Today, Inc., a Virginia corporation which operates Professional Massage and Health Studios; Delores T. Curlee, owner of Antler Massage and Antler Annex; and Debra M. Radabaugh, a former masseuse at Hide-A-Way Health Club. The defendants, officials of the County of Henrico, are: Edward A. Beck, County Manager; and Gordon W. Jinkins, Jr., Eugene T. Rilee, Jr., Anthony P. Mehfoud, Charles M. Johnson and Linwood E. Toombs, Members of the Board of Supervisors, the governing body of the county.[1] Jurisdiction of the suit is attained pursuant to 28 U.S.C. §§ 1343(3), 2201 and 2202.

Plaintiffs seek a declaration that the ordinance in question is violative of the Constitution and laws of the United States and seek an injunction against the future enforcement of the ordinance against plaintiffs. They assert that the County of Henrico ordinance is violative of the Due Process Clause of the Consti-

---

1. The County Attorney, William G. Broaddus, was also named as a party defendant in the complaint. Upon the agreement of counsel for both parties and for good cause, the Court ordered the action dismissed as to defendant Broaddus on November 25, 1974.

tution in that: (1) it is vague and overly broad; (2) it denies plaintiffs the opportunity to protect themselves by prohibiting the locking of main entrance and passageway doors; (3) it grants the Chief of Police unlimited discretion as to the licensing of massage establishments; (4) it requires the maintenance of records of patrons beyond that required of other commercial establishments; and (5) it is pre-empted by and inconsistent with a general state statutory scheme dealing with offenses against morality and decency. Plaintiffs also contend that the ordinance violates the Equal Protection Clause by virtue of its alleged interference with plaintiffs' fundamental right to engage in a lawful occupation absent evidence of a compelling state interest or a rational basis and its underinclusive nature in declaring certain conduct unlawful only when performed within a massage establishment. They also assert that the ordinance violates the Fourth Amendment, by granting officials of the county building, health and police departments the authority to inspect private commercial areas. Plaintiff Radabaugh alone contends that the ordinance violates her right of privacy and, therefore, the Fourteenth Amendment, by imposing criminal sanctions on heterosexual relations between consenting adults when performed within the privacy and seclusion of a massage establishment.

The matter first came on for hearing on November 12, 1974, when the Court granted a temporary restraining order against the defendants. On November 22, 1974, the Court entered its order for an additional seven-day period.

At the threshold of the Court's inquiry into this matter is the defendants' allegation that the Court lacks jurisdiction over this suit. Defendants challenge plaintiffs' standing to attack the ordinance in question and suggest there exists no actual case or controversy over which the Court can exercise its judicial power pursuant to Article III of the Constitution. The test which the Court must apply under these circumstances is whether the party who invokes the power of the Court to annul legislation on grounds of unconstitutionality is "able to show not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement . . . ." Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923), cited in Poe v. Ullman, 367 U.S. 497, 505, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). The facts before the Court show that the Chief of Police mailed to certain of the plaintiffs' respective places of business a letter containing a copy of the ordinance and application form for licensing, and additionally specified the effective date of the ordinance, six days hence. The Court finds this fact, together with the County Attorney's statement at hearing that plaintiffs will be prosecuted for their failure to comply with the provisions of the challenged ordinance, renders this cause, in a real sense, adversary in nature and therefore appropriate for adjudication.[2]

Defendants further contend that if this is a suit brought against them in their official capacities, the Court is barred by City of Kenosha v. Bruno, 412

---

2. Defendants' reliance on Poe v. Ullman, *supra*, and Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is misplaced in this regard. In *Poe*, for example, the Court found the prosecutor's statements, that in the course of his public duty he intended to prosecute any offenses against state law, did not constitute an immediate threat to plaintiffs, in light of the state's failure to prosecute any individual under the challenged statute in the eighty years since its enactment.

Moreover, while the Court in *Younger* held that three of the four plaintiffs lacked standing, the Court explicitly stated: "If these three had alleged that they would be prosecuted for the conduct they planned to engage in, and if the District Court had found this allegation to be true—either on the admission of the State's district attorney or on any other evidence—then a genuine controversy might be said to exist." 401 U. S. at 42, 91 S.Ct. at 749.

U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), from granting plaintiffs the equitable relief they seek. Alternatively, defendants allege that if this suit is construed as one against them in their individual capacities, they may raise the bar of official immunity.

 Defendants' contention, often encountered since the Supreme Court's decision in City of Kenosha v. Bruno, that municipal officials are not amenable to suit in their official capacities for purposes of providing civil rights plaintiffs with equitable relief because not "person[s]" within the language of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), lacks merit. It has been settled since Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) that 42 U.S.C. § 1983 confers jurisdiction upon the federal district courts to hear civil rights action for both monetary and equitable relief against municipal officials in their official capacities.[3] This holding was reiterated only last year by this Circuit's decision in Harper v. Kloster, 486 F.2d 1134 (4th Cir. 1973). A court order granting the plaintiffs the kind of injunctive relief they seek—a prohibition against enforcement of Henrico's massage parlor ordinance—can only operate against the defendants in their official capacities because the defendants lack the authority to operate the apparatus of government in their individual and private capacities. See, The Supreme Court, 1972 Term, 87 Harv.L.Rev. 57, 259 & n. 36 (1973).

 Defendants' attempt to hang the plaintiffs on the horns of a dilemma with their alternative argument: That if this action is construed as one against them in their individual capacities, they are protected by the doctrine of official immunity. Defendants' efforts to impale plaintiffs with this horn must fail. The doctrine of common law immunity grants limited protection from suits for monetary damages to public officials who perform discretionary duties in good faith. The rationale underlying the immunity doctrine was the fear that suits for money damages would chill vigorous and robust decisionmaking by public officials. Scheuer v. Rhodes, 416 U.S. 232, 240, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This immunity from suit for monetary damages accorded public officials who act in good faith has been incorporated into § 1983 doctrine. Hill v. Rowland, 474 F.2d 1374, 1377 (4th Cir. 1973). The chilling effect on decision making occasioned by suits for monetary damages, however, is not present when equitable relief is sought so that "the doctrine of immunity . . . has no application to a suit for declaratory or injunctive relief." Rowley v. McMillan, 502 F.2d 1326, 1331 (4th Cir. 1974).

Finally, defendants argue that federal injunctive relief is unavailable to plaintiffs since they have not alleged facts sufficient to support a finding that "the danger of irreparable loss is both great and immediate." Fenner v. Boykin, 271 U.S. 240, 243, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926). The Court is of the opinion that at this juncture of the controversy, this allegation goes to the merits of plaintiffs' cause of action. As such it must be considered by the Court in conjunction with the other pertinent factors bearing upon the propriety of the

---

3. Defendants construct an elaborate syllogism based on City of Kenosha v. Bruno to prove that since a suit against municipal officials for equitable relief is, in effect, a suit against the municipality itself for equitable relief—a result which is forbidden by *City of Kenosha*—this Court must therefore decline jurisdiction over municipal officials in their official capacity when civil rights plaintiffs seek equitable relief. The Monroe v. Pape Court based its conclusion that municipal officials were amenable to suit under § 1983, even though a § 1983 damage action would not lie against a city, on its reading of the legislative history of the 1871 Civil Rights Act. The Court in City of Kenosha v. Bruno built upon this dichotomy established by Monroe v. Pape in reaching the conclusion that a municipality was not a "person" for purposes of § 1983 equitable relief. There is, however, extensive scholarly criticism demonstrating that Monroe v. Pape misread the legislative history of the 1871 Act. See The Supreme Court, 1972 Term, 87 Harv. L.Rev. 57, 256 n. 21 (1973).

Court's issuing an injunction *pendente lite*. Defendants' contention in this regard, however, in no way alters the Court's finding as to the justiciability of the matter before it.

Turning to the merits of plaintiffs' motion, it is clear that the Court must consider four factors in deciding whether to grant a preliminary injunction: they are, the threat of irreparable injury to plaintiffs should preliminary injunctive relief be denied; injury to other parties should the injunction issue; the probability that the plaintiffs will succeed on the merits; and the interests of the public. Conservation Council of North Carolina v. Costanzo, 505 F.2d 498 at 502 (4th Cir. 1974); Long v. Robinson, 432 F.2d 977, 979 (4th Cir. 1970). Moreover, the Court notes that the purpose of the relief sought is "to preserve the status quo until the rights of the parties can be fairly and fully investigated and determined by strictly legal proofs and according to the principles of equity." Sinclair Refining Co. v. Midland Oil Co., 55 F.2d 42, 45 (4th Cir. 1932).

The evidence shows that plaintiffs ceased operations on November 11, 1974 immediately prior to the effective date of the challenged ordinance, which was November 12, 1974. It was on that date that the Court entered the presently effective temporary restraining order, after which, presumably, plaintiffs resumed their business operations. Preservation of the status quo, if appropriate as a practical matter, therefore would require the non-enforcement of the subject ordinance.

In terms of the element of threat of irreparable loss to the plaintiffs should the Court not issue a preliminary injunction, plaintiffs would be placed in the position of having to choose between closing down their operations, operating within the terms of the ordinance, or operating in violation of the ordinance. By selecting the first, the plaintiffs' injury, although it may be measurable in monetary terms, may constitute an irretrievable loss since there is a serious doubt as to whether the plaintiffs would have a cause of action for damages against any party. Joseph v. House, 353 F.Supp. 367, 375 (E.D.Va.), aff'd. 482 F.2d 575 (4th Cir. 1973). The second alternative may well require plaintiffs to forfeit certain constitutionally protected rights, should the county seek to act pursuant to various provisions of the ordinances, which the Court believes to be suspect. Such violations may not be, in any realistic sense, compensable by damages even were such a cause of action to exist. Indeed, this Court's view of constitutionally protected rights is such as to view the same as beyond monetary compensability except as a last possible alternative. Finally, the Court does not believe that plaintiffs should be required to expose themselves to a potential state prosecution where the equities appear to lie heavily in their favor.

In contrast, the Court finds that the effect of a preliminary injunction upon the defendants would not be substantial. While, as this Court has previously noted, any prohibition against the enforcement of a duly enacted law or ordinance is always a grave matter, Joseph v. House, *supra*, the Court considers the recency of the enactment as indicating a preliminary injunction would not work a serious deprivation to the people of the County of Henrico for whose benefit all ordinances of the county are presumably enacted.

As to the likelihood that plaintiffs will succeed on the merits of their action, the Court concludes there is a strong possibility of success as to at least three legal theories. The Court is particularly troubled by the ordinance's provisions prohibiting massage establishments from locking main entrance or passageway doors during business hours (Section 17–15(g)) and granting officials of the Division of Police an unlimited right of entry into massage establishments (Section 17–20). While the defendants argue that the circumstances of plaintiffs' business operations justify the need for administrative inspections,

implicit in such a contention is a presumption that plaintiffs will engage in criminal conduct which can only be deterred by the knowledge that the police may at any time present themselves. Such a presumption constitutes little more than speculation and does not, in the Court's opinion, provide a rational basis for imposing such restrictive measures upon plaintiffs' rights. Indeed, such speculation appears to the Court to be contra to the available statistical data which establishes that a vast majority of our citizenry do not run afoul of the criminal laws.

More specifically, presently the Court is of the opinion that Section 17–20, which appears to authorize warrantless administrative searches of massage parlors and which makes it a crime for the operator of a massage parlor to refuse to permit the county authorities to make a warrantless search, unconstitutionally intrudes upon the right of privacy protected by the Fourth Amendment. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The phrases "routine inspections" and "lawful inspection or investigation" employed in Section 17–20 are similar to that of the San Francisco Municipal Code which was the subject of Camara, supra.

■ The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment protects certain privacy rights which individuals have in their persons, their personal effects, and their homes. E. g., Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). "It marks the right of privacy as one of the unique values of our civilization and, with few exceptions, stays the hands of the police unless they have a search warrant issued by a magistrate on probable cause". McDonald v. United States, 335 U.S. 451, 453, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948).

■ The Fourth Amendment does not, however, immobilize completely all government action which seeks intrusion into protected privacy areas. The amendment explicitly recognizes that not all searches and seizures are, per se, unreasonable—that there may be some instances in which the needs of society are so great as to justify government intrusion into protected privacy areas. Camara v. Municipal Court, supra, 387 U.S. at 539, 87 S.Ct. 1727.

■ The Amendment has been interpreted as containing a balancing test whereby the public interest in permitting a municipality to make health and safety inspections of commercial establishments may be successfully asserted against the privacy interests of individuals. Id. at 538–539, 87 S.Ct. 1727. In sanctioning "reasonable" inroads upon the right of privacy guaranteed commercial establishments and their patrons, however, the Supreme Court in Camara did not jettison those procedural protections which the Amendment erects against arbitrary and indiscriminate intrusion into protected privacy areas. Id. at 531–534, 87 S.Ct. 1727. Municipalities, in order to make "reasonable" unconsented administrative searches, must comply with the "probable cause", warrant, and neutral magistrate requirements of the Fourth Amendment. The probable cause requirement is just one safeguard to insure that the government interest in arresting persons and securing evidence is not asserted lightly in the face of the constitutionally protected privacy interest. United States v. United States District Court, 407 U.S. 297, 316, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L. Ed. 1879 (1949). "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Re-

quiring more would unduly hamper law enforcement. To allow less would be to leave law abiding citizens at the mercy of the officers' whim or caprice." *Id.* at 176, 69 S.Ct. at 1311.

■ The Amendment also prescribes the general rule that the police are not to make arrests or conduct searches without first securing a warrant based upon affidavit. The warrant requirement, by its very formality, impresses upon the government the seriousness with which the Constitution regards intrusion into privacy areas which it protects. It puts the government on notice that such intrusions are not lightly countenanced and that they will be sanctioned only upon a showing of strong justification, *i. e.,* probable cause.

■ The Fourth Amendment would be reduced to a "form of words" if the Court were to countenance this administrative search ordinance which makes no pretense of compliance with the "probable cause," warrant, and neutral magistrate requirements of the Fourth Amendment.

> The practical effect of this system is to leave the occupant subject to the discretion of the official in the field. This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search. Camara v. Municipal Court, *supra,* 387 U.S. at 532, 87 S.Ct. at 1733.

United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), cited by defendants, is inapposite. Congress in the Gun Control Act of 1968, 18 U.S.C. § 921 et seq., passed legislation authorizing government agents to make unannounced, nonconsensual warrantless searches of gun shops during business hours for the limited purpose of inspecting records, ammunition and firearms. The Court held that the "urgent federal interest" in effectively controlling the traffic in firearms in order "to prevent violent crime and to assist the states in regulating the firearms traffic within

their borders" justified this limited encroachment upon the right of privacy.

■ In Biswell, the warrantless search statute could be justified as an "emergency exception to the warrant requirement." See Camara v. Municipal Court, *supra,* 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Congress, in enacting the Gun Control Act, was dealing with a problem of national dimension—the geometric increase in the crime rate due to the uncontrolled traffic in firearms—which required an urgent and somewhat Draconian solution. The massage parlor problem, if there be a problem, is local in nature and the County does not claim that the operation of massage parlors is somehow related to the incidence of violent crime. The County does seek to bring its nonconsensual warrantless search ordinance within the emergency exception accorded the Gun Control Act of 1968 by asserting that the nonconsensual, warrantless search power is "designed to lessen the environment in which contagious and debilitating diseases may spread." Defendants' brief, at 16. Defendants, however, have offered no evidence to support any such conclusion. Furthermore, they have not demonstrated that their purpose, control of contagious and debilitating diseases, can't be just as easily achieved by an administrative search power which is limited by the warrant requirement. Consequently, the present case must be governed by the administrative search requirements established by *Camara,* rather than United States v. Biswell. See also, See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Moreover, defendants' contention that these provisions are not discriminatory since a similar right of entry is included in the regulation of other occupations is not well taken. Upon examination of state statutes cited by defendants for this proposition, the Court has found none which grants officials of state or local police departments the authority to enter any commercial establishment for the purpose of conducting inspections or investigations of a gener-

al nature. See Va.Code Ann. §§ 3.1–405, 54–83.27, and 54–260.69. The Court, therefore, reaches the tentative conclusion that Section 17–20 is so facially unconstitutional that it cannot be saved by judicial construction.[4]

The Court also must conclude that on the present state of the record the plaintiffs may have a valid equal protection claim in challenging the ordinance's prohibition of certain conduct within a massage establishment which, if performed elsewhere, may be regarded as not a violation of law. In particular, the Court finds Section 17–12 of the ordinance, dealing with the touching or exposing of specific body parts, may indeed be underinclusive in character and without a rational basis. See Geisha House, Inc. v. Wilson, 43 L.W. 2152, 2153 (D.C.Sup.Ct. Sept. 25, 1974).

Further, the Court finds that Section 17–19 of Chapter 17 of the Code of the County of Henrico, which requires massage establishments to maintain records of patrons and to verify the identity of a patron by two current sources of identification, carries with it a greater burden upon plaintiffs than that suffered by any other commercial establishment in the regulation of which considerations of public health and welfare may be involved. In light of the defendants' failure, without further proof, to provide a rational basis for the unique character of this provision, the Court must conclude plaintiffs may succeed upon this claim.

On the basis of its preliminary findings, the Court concludes that the plaintiffs have shown that they are threatened with great and immediate irreparable injury, the traditional prerequisites for equitable relief. Any such injury, affecting as it does constitutional rights, is beyond that which is incidental to every criminal proceeding brought lawfully and in good faith. See Douglas v. City of Jeanette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

■ Defendants suggest, citing Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), that due regard for principles of comity and federalism compel this Court to stay its hand until the issues which plaintiffs press here are first litigated in the state court system. Younger v. Harris, *supra*, held that considerations of federalism dictate that a federal district court may not intervene to enjoin a pending state criminal prosecution absent a showing of certain exceptional circumstances, *e. g.*, a bad faith prosecution. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), decided with *Younger*, held that federal declaratory relief was likewise inappropriate where the party seeking a declaration that a statute or ordinance was unconstitutional was the object of a pending prosecution under the statute or ordinance.

■■ Intrusion into areas generally reserved to the states, *i. e.*, the enforcement of the criminal law, and the consequent impact on federalism, is considerably lessened where there is no state criminal or civil litigation pending, as is the case here. Steffel v. Thompson, 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Therefore, while there is no pending state criminal or civil litigation, a federal district court may appropriately conclude that the traditional standards for measuring the availability of equitable relief, which have been canvassed *supra*, outweigh considerations predicated upon comity and grant appropriate relief to parties

---

4. The Court is mindful that if the purpose of Section 17–20 is to ensure compliance with minimum health and safety regulations, the county authorities operating with a properly drafted administrative search ordinance will not have to meet the more exacting probable cause standard for criminal search and arrest warrants—probable cause to believe that a dwelling contains evidence of the commission of a crime. Camara v. Municipal Court, *supra*, 387 U.S. at 538–539, 87 S.Ct. 1727. On the other hand, if the County seeks to use its administrative search power to ferret out alleged criminal activity that it believes to be taking place within these establishments, then its authorities must convince a magistrate that the more exacting probable cause standard has been met.

attacking the constitutionality of state statutes and municipal ordinances. *Cf.* Steffel v. Thompson, *supra*, at 462–463, 94 S.Ct. 1209. As our Circuit recently held, " . . . *Younger* does not apply when there is neither criminal nor civil litigation pending in a state court in which questions sought to be raised in federal litigation by the same parties or those in privity with them are present." Joseph v. Blair, 482 F.2d 575, 578 (4th Cir. 1973) (Winter, J.), affirming Joseph v. House, 353 F.Supp. 367, 373 (E. D.Va.1973).

 Since there is no pending state civil or criminal litigation between the parties, the Court concludes that equitable relief is appropriate and that considerations of comity and federalism "neither authorize nor required the non-exercise of federal jurisdiction." Joseph v. Blair, *supra*, 482 F.2d at 578.

 Finally, the Court must consider the interests of the public and how they might best be served by either granting or denying plaintiffs' motion for a preliminary injunction. While the Court finds valid goals and interests exist in imposing reasonable regulations upon the operation of any commercial establishment, such interests are poorly served by permitting governmental controls which may be inconsistent with the Constitution. Moreover, the Court is hard pressed to identify any circumstances under which intrusions upon federally protected rights may be countenanced as beneficial to acceptable public interests.

The Court has addressed itself primarily to those portions of the ordinance which appear to warrant a conclusion on the present state of the record that plaintiffs have a substantial likelihood of prevailing on the merits. Other aspects of the ordinance are suspect as well.

Those aspects of the ordinance which strike the Court, on the present state of the record, as being deficient are: Section 17–4(g) and (h), Section 17–6(c), Section 17–7 excepting the first sentence thereof, Section 17–9(a) insofar as it applies to (g) and (h) of Section 17–4, and Section 17–11(c).

The parties not having addressed their respective memoranda to each specific section of the ordinance, the Court deems it inappropriate to at this stage of the proceedings expound on this view. Suffice it to note, however, that the Court is fully aware of the propriety of the County of Henrico regulating that which they seek to do by Chapter 17[5] of the Code of the County of Henrico, but until the parties have been heard in full, a preliminary injunction must issue to the end that the status quo be maintained.

An appropriate order shall issue.

## APPENDIX

### Exhibit A

An Ordinance amending and reordaining the Code of the County of Henrico by adding therein Chapter 17 containing Article I–IX regulating massage parlors, bath parlors, health clubs and similar establishments; providing for licensing of such establishments and certain employees of said establishments; setting standards for the operation of said establishments and stating penalties for violation of any provision of the ordinance.

BE IT ORDAINED BY THE BOARD OF SUPERVISORS OF THE COUNTY OF HENRICO, VIRGINIA:

1. That the Code of the County of Henrico is amended and reordained by adding therein Chapter 17 containing Articles I–IX as follows:

### CHAPTER 17

### ARTICLE I

§ 17–1. *Definitions:*

For purposes of this ordinance, the following phrases and words shall have the meaning assigned below unless the

5. See attached Appendix—Chapter 17 of the Code of the County of Henrico.

context clearly requires a different meaning.

a. "Massage"—shall mean any method of pressure on or friction against, or stroking, kneading, rubbing, tapping, pounding, or stimulating the external parts of the body with the hands or with the aid of any mechanical or electrical apparatus or appliances and shall include any physical contact between a massage technician as defined herein and a patron as defined herein in the preparation for, giving or drying after a Turkish, Russian, Swedish, vapor, sweat, electric, salt, shower, sponge or any other kind or character of baths.

b. "Massage Establishment"—shall mean any establishment having a fixed place of business where any person, firm, association or corporation engages in, conducts, carries on or permits to be engaged in, conducted or carried on any of the activities defined as a massage or the giving of Turkish, Russian, Swedish, vapor, sweat, electric, salt, shower, sponge or any other kind or character of baths when the patron is assisted by a massage technician.

c. "Massage Technician"—shall mean any person, male or female, who for any form of consideration gives or administers to a patron a "massage" as defined in this ordinance or who gives or administers a massage to a patron who has paid any form of consideration whatsoever for the massage to a third person.

d. "Operating Permit"—shall mean the permit to operate a massage establishment required by this ordinance.

e. "Technician Permit"—shall mean the permit to engage in the activities of a massage technician required by this ordinance.

f. "Sexual or Genital Parts"—shall include the genitals, pubic area, buttocks or anus of any person and the breasts of a female person.

g. "Patron"—shall mean the person receiving the massage or taking the bath.

h. "Person"—shall mean any individual and any partnership, association, or corporation where the use of the term permits such meaning.

## ARTICLE II

§ 17–2. *Massage Establishment Operating Permit Required:*

It shall be unlawful for any person to engage in, conduct or carry on or permit to be engaged in, conducted or carried on, in or upon any premises within the County of Henrico the operation of a massage establishment without first obtaining a permit from the Chief of Police of the County of Henrico. Any permit issued pursuant to this Article shall be non-transferable either from person to person or from one place of business to another place of business.

§ 17–3. *Massage Establishment Operating Permit Procedure and Fees:*

Any person, partnership or corporation desiring to obtain a permit to operate a massage establishment shall make an application to the Chief of Police on a form provided by the Chief of Police. A nonrefundable fee of one hundred dollars ($100) shall accompany the submission of each application to defray, in part, the costs of investigation and reports. The fee required herein shall be in addition to any business license tax or other fee required by law.

§ 17–4. *Application Contents:*

The application for a massage establishment operating permit under this ordinance shall set forth the proposed place of business and facilities therefor and the name and address of each applicant. In addition to the foregoing, any applicant for a license shall furnish the following information:

a. The previous addresses of applicant, if any, for a period of five (5) years immediately prior to the date of the application and the dates of residence at each.

b. Written proof that the applicant is at least eighteen (18) years of age.

c. Applicant's sex, height, weight, color of eyes and hair.

d. Three (3) passport size photographs 1″ x 1″ taken within six (6) months immediately preceding the date of the application, which photographs shall be in color.

e. Business, occupation or employment history of the applicant for the five (5) years immediately preceding the date of the application.

f. All criminal convictions, criminal charges to which a plea of nolo contendere was accepted or criminal charges for which a bond forfeiture was made, if any, except traffic offenses, with a full explanation of the circumstances therefor.

g. Fingerprints of the applicant as may be required by the Chief of Police.

h. Such other identification and information as the Chief of Police may require in order to discover the truth of the matters hereinabove specified as required to be set forth in the application.

i. If the applicant is a corporation, the name of the corporation shall be set forth exactly as shown in its Articles of Incorporation, together with the names and residence addresses of each of its officers, directors, and [each stockholder holding more than five per cent (5%) of the stock of the corporation.] If the applicant is a partnership, the application shall set forth the name and residence address of each of the partners, including limited partners. If one or more of the partners is a corporation, the provision of this section pertaining to a corporate applicant shall apply. If the applicant is a corporation or partnership, the president of the corporation or the principal partner shall furnish the information required by paragraphs "a" through "h" of this section.

§ 17-5. *Renewal of Operating Permit*

The operating permit issued pursuant to this ordinance shall last for one year's duration and must be renewed at the expiration of each year by following the same procedure set forth in this Article.

A nonrefundable fee of seventy five dollars ($75) shall accompany each application for renewal of an operating permit.

§ 17-6. *Issuance of Operating Permit*

The Chief of Police shall issue the operating permit when the applicant has fully complied with the requirements of this Article and Article V unless

a. The applicant knowingly made a material misstatement in the application for a license, or

b. The applicant has, within five (5) years immediately preceding the date of the filing of the application, been convicted of or pleaded nolo contendere to or forfeited bond on any felonious criminal charge or any misdemeanor criminal charge involving theft of property, assault or battery, drugs, or violations of Article I of Chapter 4 of Title 18.1 of the Code of Virginia. If the applicant is a corporation or a partnership, this provision shall apply to each stockholder or partner owning or having in excess of 5% interest of said corporation or partnership, or

c. The Chief of Police determines from existing facts that the applicant has previously engaged in unlawful felonious activities or other activities specified in § 17-6(b) which make the issuance of the permit injurious to the public health, safety or welfare.

The Chief of Police shall not refuse to issue an operating permit unless he first states the reason in writing.

### ARTICLE III

§ 17-7. *Massage Technician's Permit Required*

It shall be unlawful for any person to act as massage technician in or upon any premises within the County of Henrico without first obtaining a permit from the Chief of Police. The permit shall designate the massage establishment at which the technician shall work and the technician shall not work at any other establishment under that permit

without first obtaining the approval of the Chief of Police, which approval shall not be unreasonably withheld.

## § 17–8. *Massage Technician Permit Procedure and Fees*

Any person desiring to obtain a permit to act as a massage technician shall make an application to the Chief of Police on a form provided by the Chief of Police. A nonrefundable fee of one hundred dollars ($100) shall accompany the submission of each application to defray, in part, the costs of investigation and report.

## § 17–9. *Application Contents*

a. The applicant for a permit shall furnish all of the information required by paragraph "a" through "h" of § 4 of Article II of this ordinance.

b. The applicant shall furnish a certificate from a medical doctor licensed to practice in the Commonwealth of Virginia stating that the applicant has, within fourteen (14) days immediately preceding the date of the application, been examined and found to be free of any contagious or communicable disease including tuberculosis, syphillis, gonorrhea, and skin fungus or infections but excluding the common cold and closely related ailments.

## § 17–10. *Renewal of Technician Permit and Health Certificate*

a. The technician permit issued pursuant to this ordinance shall last for twelve (12) months duration and must be renewed by following the same procedure set forth in this Article. A nonrefundable fee of fifty dollars ($50) shall accompany each application for renewal of a permit.

b. Each six (6) months following the issuance of the initial permit the massage technician must furnish a medical examination certificate required by § 17–9(b).

## § 17–11. *Issuance of Technician Permit*

The Chief of Police shall· issue the permit when the applicant has fully complied with the requirements of Article III unless:

a. The applicant knowingly made a material misstatement in the application for a permit,' or

b. The applicant has, within five (5) years immediately preceding the date of the filing of the application, been convicted of or pleaded nolo contendere to or forfeited bond on any felonious criminal charge or any misdemeanor criminal charge involving theft of property, assault or battery, drugs, or violations of Article I of Chapter 4 of Title 18.1 of the Code of Virginia.

c. The Chief of Police determines from existing facts that the applicant has previously engaged in unlawful felonious activities or other activities specified in § 17–11(b) which make the issuance of the permit injurious to the public health, safety or welfare.

The Chief of Police shall not refuse to issue a permit unless he first states the reason in writing.

## ARTICLE IV

## § 17–12. *Unlawful Acts by Massage Technicians or Patrons*

a. It shall be unlawful for any person, in a massage establishment, to place his or her hand or hands upon, to touch with any part of his or her body, to fondle in any manner, or to massage, a sexual or genital part of any other person.

b. It shall be unlawful for any person, in a massage establishment, to expose his or her sexual or genital parts, or any portion thereof, to any other person. It shall also be unlawful for any person, in a massage establishment, to expose the sexual or genital parts, or any portion thereof, of any other person.

c. It shall be unlawful for any person, while in the presence of any other person in a massage establishment, to fail to conceal with a fully opaque covering, the sexual or genital parts of his or her body.

## § 17–13. *Unlawful Acts by Massage Establishment Owners*

It shall be unlawful for any person owning, operating or managing a massage establishment, knowingly or having knowledge of such facts as are sufficient to give him constructive knowledge, to cause, allow, or permit in or about such massage establishment, any agent, employee, or any other person under his control or supervision to perform such acts prohibited in section 1 of this Article.

### ARTICLE V

## § 17–14. *Massage Establishment Facilities*

No permit to conduct a massage establishment shall be issued unless an inspection by the County Office of Building Construction and Inspections and the Department of Public Health reveals that the establishment complies with each of the following minimum requirements:

a. The building in which the establishment is located is in compliance with all existing building and related codes, provided, however, that this subsection shall not be applicable to any establishment lawfully doing business at the designated location prior to the effective date of this ordinance.

b. The establishment is located in excess of three hundred (300) feet from any residentially zoned property or residence unless the establishment was lawfully doing business at the designated location prior to the effective date of this ordinance.

c. A light level of no less than ten (10) foot candles at any point within the room shall be maintained in each room or enclosure where massage services are performed on patrons.

d. A minimum of one (1) tub or shower, and one (1) toilet and wash basin shall be provided in every massage establishment; provided, however, that if male and female patrons are to be served simultaneously at said establishment, a separate massage room, or rooms, separate dressing facilities, separate tub, shower and bathing facilities and separate toilet facilities shall be provided for male and female patrons. Further, in those establishments where steam rooms or sauna baths are provided, if male and female patrons are to be served simultaneously, separate steam rooms or sauna rooms shall be provided for male and female patrons.

Sauna baths and electrical equipment must be tested for safety by Underwriters Laboratories and currently listed by Underwriters Laboratories.

e. Cabinets shall be provided for the storage of clean linen. Approved receptacles shall be provided for the storage of all soiled linen and paper towels.

f. Minimum ventilation shall be provided in accordance with the Virginia Uniform Statewide Building Code.

g. All building, plumbing and electrical installations shall be installed under permit and inspection of the County Office of Building Construction and Inspections, and such installation shall be installed in accordance with the Virginia Uniform Statewide Building Code. All massage equipment electrically operated must be listed by Underwriters Laboratories, and maintained in a safe condition, and must be grounded and bonded properly as required by the National Electric Code.

h. The walls in all rooms where water or steam baths are given shall be painted with a washable, mold-resistant paint of light color.

i. All lavatories or wash basins shall be provided with hot and cold running water, soap and single-service towels in wall-mounted dispensers.

j. Security deposit facilities capable of being locked by the patron shall be available for the protection of the valuables of the patrons.

## § 17–15. *Massage Establishment Operating Requirements*

a. Every portion of a massage establishment, including appliances, apparatus and personnel, shall be kept cleaned and operated in a sanitary condition.

b. All massage establishments shall be provided with clean and sanitary towels, sheets and linens in sufficient quantity. Towels, sheets and linens shall not be used by more than one (1) person unless the same has first been laundered. Heavy white paper may be substituted for sheets provided that such paper is used once for each person and then discarded into a sanitary receptacle.

c. All walls, ceilings, floors, pools, showers, bathtubs, steam rooms, and all other physical facilities for the establishment must be in good repair and maintained in a clean and sanitary condition. Wet and dry heat rooms, steam or vapor rooms, or steam or vapor cabinets, shower compartments, and toilet rooms, shall be thoroughly cleaned and disinfected with a disinfectant approved by the Department of Public Health each day the business is in operation. Bathtubs shall be thoroughly cleaned and disinfected with a disinfectant approved by the Department of Public Health after each use.

d. Disinfecting agents and sterilizing equipment approved by the Department of Public Health shall be provided for any instruments used in performing acts of massage and such instruments shall be disinfected after being used upon each patron.

e. Pads used on massage tables shall be covered in a workmanlike manner with durable, washable plastic or other acceptable waterproof material.

f. No massage may be given within any cubicle, room, booth or any area within a massage establishment which is fitted with a door capable of being locked.

g. The main entrance to the massage establishment may not be locked during business hours and no passage way doors shall be locked during business hours.

### § 17–16. *Unlawful Acts*

It shall be unlawful for any person to conduct, operate or carry on the operation of a massage establishment in violation of any of the provisions of this Article. It shall be unlawful for any massage technician to give massages in any establishment which operates in violation of any provision of this Article.

### § 17–17. *Effective Date of Sections of Article V*

The provisions of § 17–14 of this Article shall immediately apply to all massage establishments which are initially opened after the effective date of this ordinance or moved to different locations after the effective date of this ordinance or which make physical improvements to its place of business after the effective date of this ordinance. The provisions of § 17–14 shall apply to all other establishments six (6) months and thereafter from the effective date of this ordinance. The provisions of § 17–15 of this Article shall apply to all establishments from the effective date of this ordinance.

## ARTICLE VI

### § 17–18. *Display of Permits and Licenses*

The owner or operator of a massage establishment shall display the massage establishment operating permit and the technician permit of each and every massage technician employed in the establishment in an open and conspicuous place on the premises.

### § 17–19. *Records of Treatment*

Every person, association, firm or corporation operating a massage establishment under a permit issued pursuant to this ordinance shall keep a record of the date of each treatment, the name and address of the patron, and the name of the technician administering such treatment. Identity of the patron shall be verified by two different current sources of identification. Such record shall be open to inspection by officials charged with the enforcement of these provisions for the purposes of law enforcement and for health reasons. The information furnished or secured as a result of this provision shall be confiden-

tial save it may be disclosed for reasons of health or law enforcement. Any disclosure or use of such information by any officer or employee of the County of Henrico not authorized by the Chief of Police or his designee for reasons of health or law enforcement shall constitute a misdemeanor, and such officer or employee shall be subject to the penalty provisions of this Code in addition to any other penalties provided by law. Such records required by this section shall be maintained for a period of one (1) year from the date thereof.

## § 17–20. *Right of Entry*

For purposes of conducting routine inspections, officials of the County's Office of Building Construction and Inspections, the Department of Public Health, and the Division of Police shall have the right of entry into the premises of any massage establishment during the hours such massage establishment is open for business. It shall be unlawful for any person to hinder, delay, prevent or refuse to permit any lawful inspection or investigation of a massage establishment by any such officer.

## § 17–21. *Suspension or Revocation of Operating Permit or Technician Permit*

In the event that any person holding an operating permit or a technician permit issued pursuant to this ordinance shall violate or cause or permit to be violated any of the provisions of this ordinance, or any provision of any other ordinance or law relating to or regulating said business or occupation, or shall conduct or carry on such business or occupation in an unlawful manner, the Chief of Police may, in addition to other penalties provided by ordinance or State law, suspend or revoke the permit after the permittee has been given the opportunity for a hearing. A hearing shall not be required where the Chief of Police determines a suspension is required to protect the County from immediate danger and said suspension does not last for over three (3) days. For the purpose of this section, a criminal court conviction shall not be required to support a finding of a violation of any law.

## § 17–22. *Appeal of Decision of the Chief of Police*

In the event that the Chief of Police shall refuse to issue an operating permit pursuant to § 17–6 or a massage technician permit pursuant to § 17–11, the applicant shall have a right of appeal to the County Manager who shall determine the correctness of the action of the Chief of Police and whose decision shall be the final administrative decision. In the event that the County Manager shall refuse to cause the permit to be issued, he shall state the reason or reasons in writing.

## ARTICLE VII

### § 17–23. *Exemptions*

This ordinance shall not apply to the following classes of individuals while engaged in the performance of the duties of their respective professions as long as such duties are not performed on patrons in massage establishments:

a. Physicians, surgeons, chiropractors, osteopaths or physical therapists who are duly licensed to practice their respective professions in the Commonwealth of Virginia and employees of nursing homes and hospitals which are duly licensed by the Commonwealth of Virginia.

b. Nurses who are registered under the laws of this Commonwealth.

c. Trainers of any amateur, semiprofessional or professional athlete or athletic team.

d. Barbers and beauticians who are duly licensed under the laws of this Commonwealth.

## ARTICLE VIII

### § 17–24. *Severability*

If any section, subsection or portion of this ordinance is declared invalid by a court of competent jurisdiction for any reason, such section, subsection or portion shall be severable and the remain-

ing sections and provisions shall continue in full force and effect.

## ARTICLE IX

### § 17–25. *Effective Date*

This ordinance shall become effective sixty (60) days after adoption by the Board of County Supervisors of Henrico County.

## ON MOTION TO PARTIALLY VACATE

Plaintiffs, massage parlor operators and a former masseuse, have attacked in this Court the constitutionality of certain provisions of a recently enacted Henrico County, Virginia massage parlor regulating ordinance, Chapter 17, Articles I–IX of the Code of the County of Henrico. Under date of November 29, 1974, an order enjoining *in toto* the application of the ordinance was entered. See Hogge v. Hedrick, Civil Action No. 74–0488–R, Mem. decis. and Order (E. D.Va., Nov. 29, 1974). Defendants, relying on a severability clause in the ordinance, appropriately move the Court to partially vacate its order of November 29, 1974, as to those provisions in the ordinance which are facially constitutional.

Defendants have represented to the Court that the purpose of this ordinance is to protect the health, safety and welfare of the citizens of the County of Henrico. In particular, defendants maintain that the ordinance is designed to "prevent the spread of contagious diseases," by improving "the sanitary conditions in those commercial establishments where it is likely that persons will come in close physical contact with articles with which other persons have been in close contact." [Defendants' Brief]

That the defendants are presently entitled to some relief is apparent. For the instant purpose the Court has reviewed the ordinance utilizing what it deems to be the appropriate standard of review as suggested by the defendants. In short, are the provisions of the ordinance rationally related to the regulation of sanitary conditions in massage establishments. [Defendants' Brief, at 21].

In its previous memorandum, the Court made preliminary determinations about the unreasonableness of § 17–15(g) (requirement that massage parlors maintain records of patrons and verify the identity of patrons by two current sources of identification), and the unconstitutionality of § 17–20 (warrantless no-knock administrative search power) and § 17–12 dealing with the exposure and touching of genitals. Defendants do not ask the Court to disturb its order as to these sections of the ordinance, nor do they seek to have the Court vacate its order as to § 17–13 or the second sentence of § 17–7 dealing, respectively, with responsibility of owners, operators and managers for the acts of others, and the utilization of a valid permit by a massage technician anywhere excepting a specified designated massage establishment.

Defendants contend that plaintiffs in their complaint expressed no grievance in reference to § 17–4(g) and (h) (fingerprint and "other identification and information as the Chief of Police may require to discover the truth, etc.") and as to §§ 17–6(c) and 17–11(c) dealing with the Chief of Police's responsibility to refuse permits in certain instances, that plaintiffs having failed to produce evidence that they would be affected, there is no reason to continue the injunction as to those sections of the ordinance.

It is to be noted that the Court referred in its memorandum of November 29, 1974 to each of these sections on the then record as being (facially) deficient. Additionally, plaintiffs sought and still seek an enjoinment of the whole ordinance. At this stage, plaintiffs contend they are entitled to the maintenance of the status quo until the entire matter is resolved. The record is still devoid of any evidence excepting the affidavits filed by plaintiffs in their quest for a temporary restraining order.

The Court has, however, had the benefit of the parties' memoranda and argu-

ments and concludes that defendants' instant motion to vacate a portion of the Court's order of November 29, 1974 is well taken. Additionally, the County of Henrico should not be prevented from regulating that which is constitutionally within its purview. It must be recognized, however, that protection of plaintiffs from constitutional injury, as well as the Court's duty to the Constitution itself, requires that in the examination of the provisions of the ordinance in issue which bear a reasonable relationship to the pronounced purpose of same, a determination at this time of any provisions which appear facially unconstitutional and perforce the subject of further proceedings will mandate a refusal to vacate that particular provision.

The forthrightness of the County Attorney in seeking only a partial modification of the Court's prior order has rendered the instant task less onerous.

Sections 17–4(g) and 17–9(a), respectively, authorize the Chief of Police to require those seeking massage parlor operating permits and "massage technicians" to submit fingerprints with their permit applications. The test as suggested by defendants is whether such provisions bear a reasonable relationship to the protection of health and safety interests, and more specifically, the prevention of "the spread of contagious diseases." On the present record the Court cannot conclude that a fingerprinting requirement for massage parlor operators and technicians is rationally related to furtherance of the health and safety purposes of the ordinance. The fingerprinting requirement intrudes upon protected privacy interest and, on the present state of the record, appears to needlessly stigmatize those to be subjected to it with the indicia of criminality for no apparent rational basis.

Sections 17–4(h) and 17–9(a) empower the Chief of Police to require of applicants for operating and technician permits "[s]uch other identification and information as [he needs] in order to discover the truth of the matters" in the application. The Court fears that this unfettered right of inquiry may be subject to misuse and abuse to the detriment of protected privacy interests and it does not believe that the vesting of such broad inquisitorial powers in the Chief of Police is necessary for furtherance of the health and sanitation aims of the ordinance.

Section 17–7 (second sentence) restricts the right of a technician to leave the employ of one establishment and begin employment in another establishment without first obtaining the approval of the Chief of Police. The Court believes that the approval requirement arbitrarily hampers the economic mobility of technicians while serving no legitimate governmental purpose.

Sections 17–6(c) and 17–11(c) permit the Chief of Police to deny permits to operators and technicians when he "determines from existing facts, that the applicant has previously engaged in unlawful felonious activities or other activities specified in § 17–6(b) which make the issuance of the permit injurious to the public health, safety or welfare." The Court concludes that these two sections which permit the Chief of Police to deny permits on the basis of alleged wrongful conduct without having afforded the applicant the minimum procedural safeguards—notice of charges, a hearing, the right of cross examination, the opportunity to rebut and put on evidence in one's behalf—mandated by the due process clause of the Fourteenth Amendment are constitutionally inadequate to the task of protecting an applicant's interest in "liberty" and, therefore, the injunction must remain in effect as to them as well.

The Chief of Police exercises judicial power[1] in making the permit decision, because he must apply facts to a stand-

---

1. There is authority that a governmental agency exercising judicial power when granting or denying permits or licenses must always afford an applicant procedural due process, e. g., Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964), but the Court need not rest its tentative conclusion that §§ 17–6(c) and 17–11(c) are unconstitutional on this ground alone.

ard—provided in this case by certain provisions of the criminal code—before determining whether an applicant is entitled to an operator's or technician's permit. Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964). If the Chief of Police finds from "existing facts" that the applicant has engaged in proscribed wrongdoing, he is required to deny the permit and state in writing his reasons for so doing.

The permit procedure as outlined in §§ 17–6(c) and 17–11(c) raise the possibility that an applicant may be stigmatized as a wrongdoer despite the fact that he or she has never been adjudicated a criminal in a court of law. The Chief of Police's determinations about an applicant's allegedly wrongful conduct may, therefore, affect his or her "liberty" interest. The liberty interest protected by the due process clause is not confined to the interest in avoiding incarceration. Board of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Supreme Court has held that one's reputation and good name are integral to the concept of liberty. Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). A determination that one has engaged in wrongful conduct may infringe this broad liberty concept when it constrains present action by precluding one from following one's chosen profession and when it constrains future action by limiting one's ability to obtain future employment, or by damaging one's "standing and associations in [one's] community." Board of Regents v. Roth, *supra*, at 573, 92 S. Ct. 2701. As the Court said in Wisconsin v. Constantineau, *supra*, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.*, at 437, 91 S.Ct. at 510.

Because §§ 17–6(c) and 17–11(c) do not provide those minimum procedural

safeguards which go far toward ensuring that the fact finder makes the permit determination on the basis of fact and not rumor, suspicion and conjecture, they inadequately protect an applicant's liberty interest [2] and they must, therefore, remain under the Court's order of November 29th.

The Court also has serious doubts about the rationality, in view of the expressed purpose of this ordinance, of § 17–6(b) which permits the Chief of Police to reject the applications of corporate applicants for operators licenses when any stockholder or partner has "within five (5) years immediately preceding the date of the filing of the application been convicted of or pleaded nolo contendre to or forfeited bond on any felonious criminal charge or any misdemeanor criminal charge involving theft of property, assault or battery, drugs, or violations of Article 1 of Chapter 4 of Title 18.1 of the Code of Virginia." The injunction must remain in effect as to this section pending further proceedings before the Court. Additionally, as to § 17–4(i), the Court fails to find a rational basis related to the pronounced legislative purpose for the requirement that a corporate applicant list the names and addresses of each stockholder holding more than five percent (5%) of the stock of the corporation. The figure five percent (5%), at the least, appears to be an arbitrary one on this state of the record.

Finally, the Court has examined the ordinance and has determined that the injunction may be lifted as to the following facially constitutional provisions: §§ 17–1; 17–4(a), (b), (c), (d), (e), (f), (i), excepting the phrase "each stockholder holding more than 5% of the stock of the corporation."; 17–5; 17–6(a) (first sentence); 17–8; 17–9(a) (except as modified by exclusion of § 17–4(g) and (h); 17–9(b); 17–10(a) and (b); 17–11(a), (b); 17–14; 17–15(a)–

---

2. The Court at this time expresses no opinion as to whether an applicant may have a "property" interest in engaging in either the

massage operator or massage technician professions which must be protected by the due process clause.

(e); 17–17; 17–18; 17–21; 17–22; 17–23; and 17–24.

Counsel for the defendants has indicated in open court that all applications required by the ordinance will, barring unforeseen contingencies, be processed within seven to ten days. The Court has prior hereto, from the bench, stated its intention to vacate portions of its injunctive order, hence an effective date of February 1, 1975 for the unrestrained portions of the ordinance to become effective appears appropriate.

An order consistent herewith will enter.