## CONSUMERS UNION OF UNITED STATES, INC., et al., Plaintiffs,

v.

## AMERICAN BAR ASSOCIATION et al., Defendants.

### No. 75–0105–R.

United States District Court, E. D. Virginia, Richmond Division.

Dec. 17, 1976.

Peter H. Schuck, Marsha N. Cohen, Washington, D.C., James W. Benton, Jr., Hill, Tucker & Marsh, Richmond, Va., for plaintiffs.

H. Merrill Pasco, John H. Shenefield, Virginia Hackney, Hunton & Williams, Stuart H. Dunn, John F. Rick, Asst. Attys. Gen., Richmond, Va., for defendants.

Before BRYAN, Circuit Judge, and MERHIGE and WARRINER, District Judges.

MERHIGE, District Judge.

Plaintiffs bring this action to redress an alleged violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983. Plaintiffs seek a declaration that the defendants have violated the First and Fourteenth Amendment rights of the plaintiffs and their members to gather, publish and receive factual information in reference to attorneys practicing in Arlington County, Virginia, and seek additionally an injunction permanently enjoining the enforcement and operation of a provision of the Codes of Professional Responsibility of the Virginia State Bar and of the American Bar Association. Jurisdiction over the action is premised on 28 U.S.C. § 1343(3).

Since the complainants, in essence, allege that a statewide professional disciplinary provision violates, on its face, provisions of the United States Constitution and seek to permanently enjoin the enforcement of the rule, a Three-Judge District Court was empaneled to hear the case pursuant to 28 U.S.C. § 2281. *See Virginia Citizens Consumer Council, Inc., et al. v. State Board of Pharmacy,* 373 F.Supp. 683 (E.D.Va.1974), *aff'd,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). *See also Hagens v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974); *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973); *Moody v. Flowers,* 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

Plaintiff, Consumers Union of United States, Inc. (hereinafter "Consumers Union"), is a nonprofit organization chartered under the laws of the State of New York whose purpose is to provide information and counsel to its members on consumer goods and services, and management of family income, and to advance the consumer interests of its members. The organization has a sizable membership residing in this judicial district, many of whom reside in Arlington County, Virginia. Plaintiff, Virginia Citizens Consumer Council (hereinafter "Consumer Council"), is a nonprofit, statewide consumer organization chartered by the State of Virginia to promote the interests of its members and of the members of its affiliated organizations, and to educate its members on the quality of available consumer goods and services. Like Consumers Union, many of its members reside in Arlington County, Virginia. Defendant American Bar Association (hereinafter "ABA") is a voluntary unincorporated association of members of the bar associations of various states including the Com-

monwealth of Virginia.[1] It solicits memberships and transacts business in Virginia, and has formulated a Code of Professional Responsibility (hereinafter the "ABA Code") to serve as a model code for the various state bar associations.[2] Defendant Supreme Court of Virginia has adopted and promulgated the Virginia Code of Professional Responsibility (hereinafter "State Bar Code") pursuant to its inherent power and statutory authority to regulate the practice of law in the Commonwealth of Virginia,[3, 4] Va.Code Ann. § 54–48 (1974); *Button v. Day,* 204 Va. 547, 132 S.E.2d 292 (1960). Defendant Virginia State Bar (hereinafter "State Bar") is the state administrative agency through which the Supreme Court of Virginia regulates the practice of law in the state;[5] membership in the State Bar is required in order to practice law in Virginia. Va.Code Ann. § 54–49, Rules for the Integration of the Virginia State Bar, Part Six, Section IV, Subsecs. 2, 3, 215 Va. 939 (1975). To insure that all of its members follow professional standards

of conduct, the State Bar has created a committee, the Committee on Legal Ethics,[6] to render advisory opinions on any question of contemplated professional conduct by its members, Rules for the Integration of the Virginia State Bar, Part Six, Section IV, Subsecs. 9, 10, 215 Va. 944–45 (1975); Rules for Integration of the Virginia State Bar, Part Six, Section V, Article VIII, 215 Va. 961 (1975), and has created a mechanism for disciplining attorneys who fail to obey the standards. Rules for the Integration of the Virginia State Bar, Part Six, Section IV, Subsection 13, 215 Va. 946 (1975); Rules of Court, Rules for the Integration of the Virginia State Bar, Part Six, Section V, Article VII, 215 Va. 961 (1975).

In 1974, plaintiff Consumers Union, through its legal and editorial staff, prepared a questionnaire to be sent to all lawyers licensed to practice in the State of Virginia who reside and maintain an office in Arlington County, Virginia. The questionnaire was designed to elicit information concerning each lawyer's office location, ed-

1. The ABA states that its purposes "are to uphold and defend the Constitution of the United States and maintain representative government; to advance the science of jurisprudence; to promote throughout the nation the administration of justice and uniformity of legislation and of judicial decisions; to uphold the honor of the profession of law; to apply the knowledge and experience of the profession to the promotion of the public good; to encourage cordial intercourse among the members of the American Bar; and to correlate and promote the activities of the bar organizations in the nation within these purposes and in the interests of the profession and the public." American Bar Association Constitution, Art. 1, § 1.2.

2. The ABA Code was adopted on August 12, 1969, and has been amended in February of 1974, 1975, and 1976. The ABA admits that it seeks to have the ABA Code adopted by the state bars.

3. The Virginia Supreme Court adopted a Code of Professional Responsibility effective January 1, 1971. It was substantially identical to the Code as originally adopted by the ABA.

4. Also named as a defendant is the Honorable Lawrence W. I'Anson, individually and in his capacity as Chief Justice of the Supreme Court of Virginia. Since any injunctive relief granted in favor of the plaintiffs may run against the

Chief Justice in his official capacity, or his successor in office in his official capacity, Fed. R.Civ.P., Rule 25(d)(1), the Court need not concern itself with the issues of whether the Virginia Supreme Court is protected from suit by the Eleventh Amendment, *see Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), or whether the Virginia Supreme Court is a "person" within the meaning of § 1983. *See Harper v. Kloster,* 486 F.2d 1134 (4th Cir. 1973); *Hogge v. Hedrick,* 391 F.Supp. 91 (E.D. Va.1975); *Canty v. City of Richmond, Virginia Police Department,* 383 F.Supp. 1396 (E.D.Va. 1974).

5. Also named as a defendant is Howard W. Dobbins, individually and in his capacity as President of the Virginia State Bar. Since any injunctive relief granted in favor of the plaintiffs may run against Mr. Dobbins in his official capacity, or his successor in office in his official capacity, the issues of whether the State Bar is protected from suit by the Eleventh Amendment, or whether the State Bar is a "person" within the meaning of § 1983 would be fruitless. *See* the authorities cited in footnote 4 *supra.*

6. Named as a defendant is Rothwell J. Lillard, individually and in his capacity as Chairman of the Legal Ethics Committee of the Virginia State Bar.

ucation, legal activities, business and professional affiliations, areas of specialization, fee and billing practices as well as client relations. The information was to be edited and, if necessary, verified, and published in the form of a directory to assist and educate consumers, including members of the Consumers Union and Consumer Council, in selecting and evaluating attorneys in the Arlington County area. It was contemplated that the directory was to be sold at its cost of production, and the publishers did not request, nor would they accept, any remuneration from any of the responding lawyers.

At that time, the State Bar Code and the ABA Code contained strict prohibitions on most lawyer advertising. The Codes were virtually identical:

DR 2–101 Publicity in General.

(A) A lawyer shall not prepare, cause to be prepared, use, or participate in the use, of any form of public communication that contains professionally self-laudatory statements calculated to attract lay clients; as used herein, "public communication" includes, but is not limited to, communication by means of television, radio, motion picture, newspaper, magazine, or book.

(B) A lawyer shall not publicize himself, his partner, or associate as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in city or telephone directories, or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf except as permitted under DR 2–103. This does not prohibit limited and dignified identification of a lawyer as a lawyer as well as by name:

(1) In political advertisements when his professional status is germane to the political campaign or to a political issue.

(2) In public notices when the name and profession of a lawyer are required or authorized by law or are reasonably pertinent for a purpose other than the attraction of potential clients.

(3) In routine reports and announcements of a bona fide business, civic, professional, or political organization in which he serves as a director or officer.

(4) In and on legal documents prepared by him.

(5) In and on legal textbooks, treatises, and other legal publications, and in dignified advertisements thereof.

(C) A lawyer shall not compensate or give anything of value to representatives of the press, radio, television, or other communication medium in anticipation of or in return for professional publicity in a news item.

DR 2–102 Professional Notices, Letterheads, Offices, and Law Lists.

(A) A lawyer or law firm shall not use professional cards, professional announcement cards, office signs, letterheads, telephone directory listings, law lists, legal directory listings, or similar professional notices or devices, except that the following may be used if they are in dignified form:

&ast; &ast; &ast; &ast; &ast; &ast;

(5) A listing of the office of a lawyer or law firm in the alphabetical and classified sections of the telephone directory or directories for the geographical area or areas in which the lawyer resides or maintains offices or in which a significant part of his clientele resides and in the city directory of the city in which his or the firm's office is located; but the listing may give only the name of the lawyer or law firm, the fact he is a lawyer, addresses, and telephone numbers. The listing shall not be in distinctive form or type. A law firm may have a listing in the firm name separate from that of its members and associates. The listing in the classified section shall not be under a heading or classification other than "Attorneys" or "Lawyers", except that additional headings or classifications descriptive of the type of practice referred to in DR 2–105 are permitted.

(6) A listing in a reputable law list or legal directory giving brief biographi-

cal and other informative data. A law list or directory is not reputable if its management or contents are likely to be misleading or injurious to the public or to the profession. A law list is conclusively established to be reputable if it is certified by the American Bar Association as being in compliance with its rules and standards. The published data may include only the following: name, including name of law firm and names of professional associates; addresses and telephone numbers; one or more fields of law in which the lawyer or law firm concentrates; a statement that practice is limited to one or more fields of law; a statement that the lawyer or law firm specializes in a particular field of law or law practice but only if authorized under DR 2–105(A)(4); date and place of birth; date and place of admission to the bar of state and federal courts; schools attended, with dates of graduation, degrees, and other scholastic distinctions; public or quasi-public offices; military service; posts of honor; legal authorships; legal teaching positions; memberships, offices, committee assignments, and section memberships in bar associations; memberships and offices in legal fraternities and legal societies; technical and professional associations and societies; foreign language ability; names and addresses of references, and, with their consent, names of clients regularly represented.

DR 2–102(A)(6), on its face and as interpreted, prohibits the inclusion in a law list or legal directory of any categories of information not expressly permitted by the Rule. Since the Consumers Union directory would contain some categories of information not authorized by the Rule, it appears to violate the Rule on its face. For example, the Rule prohibits, and the Consumers Union directory would contain, a variety of information on the fee and billing practices of individual lawyers. The questionnaire asked for information on whether the lawyer customarily charges a fee for an initial consultation (and if so, how much), for information on

the average fee charged for a number of common legal services, such as change of name, individual bankruptcy, representation of the complainant in an uncontested divorce, and closing and settlement on the sale of a single-family house.

Accordingly, it was recognized that few, if any, Arlington County lawyers would answer and return the questionnaires unless they were assured that their doing so would not subject them to professional disciplinary action. In reference thereto, Consumers Union contacted the State Bar and the ABA in mid-August of 1974 seeking a formal certification of the directory as a "reputable" publication in accordance with DR 2–102(A)(6). The Executive Director of the Virginia State Bar indicated that the State Bar had no law list certification procedures; and that it deferred to and relied on the ABA certification procedure. Indeed, the State Bar did not issue *any* certificates of compliance, even to ABA approved lists or directories. The ABA, however, refused to review the Consumers Union directory unless Consumers Union first paid a nonrefundable $750 fee. Since it had been clear from the outset, and it was later confirmed unofficially by a staff director of the ABA Standing Committee on Law Lists, that the ABA would not certify the directory, Consumers Union declined to pay the fee and hence did not receive a formal denial.

Thereafter, on December 8, 1974, Elaine Constance Major, an Arlington County attorney, wrote to the State Bar indicating her willingness to complete the questionnaire, her desire to be listed in the Consumers Union directory, and her apprehension that the State Bar Code prevented her from doing so. Ms. Major formally requested a ruling by the Legal Ethics Committee on the propriety of her responding to the questionnaire. On January 17, 1975, the Chairman of the Legal Ethics Committee informed her that since neither the ABA nor the State Bar had approved the directory, "the Committee had unanimously ruled that listing herself in the Consumers Union directory would violate DR 2–102(A)(6)." On June 19, 1975, the Council of the Virginia

**512**

State Bar, the main governing body of that organization,[7] considered the opinion of the Legal Ethics Committee, and adopted Legal Ethics Opinion No. 180:

> We are advised that the list about which you inquired has not been approved by the Virginia State Bar, furthermore, the information which the Consumers Union proposes to publish includes information not permitted by DR 2–102(A)(6). Accordingly, the Committee is unanimously of the opinion that DR 2–102(A)(6) makes it inappropriate for you to have your name included in the list.

At the same time, the Council voted to appoint a special committee on advertising to study DR 2–102(A)(6); the committee was created in July of 1975.

The ABA substantially amended DR 2–102(A)(6) in February of 1976 when its House of Delegates, following extended debate, adopted amendments to the Rule formulated, with minor exceptions, by its Standing Committee on Professional Discipline.[8] That rule contains several major changes.[9] First, it permits all information publishable in law lists and legal directories to also be published in the classified section (the yellow pages) of the telephone directory. Second, the new rule permits lawyers to advertise the fee they will charge for an initial consultation with a prospective client, or alternatively, that no fee will be charged. Third, lawyers are authorized to advertise that a statement or estimate of fees will be made available to a prospective client at an initial consultation. Fourth, a lawyer may advertise his acceptance of credit cards or other credit arrangements, presumably including retainer requirements and collection procedures. Fifth, office hours and other hours of availability may be published. All of the information permitted to be published under the prior rule may also be published under the current rule.

The State's Special Committee on Advertising met on several occasions, rendered several intermediate reports, and forwarded to the Council a final recommendation suggesting amendments to DR 2–102 on April 1, 1976. It is clear from the text of the report that the new ABA rule was used as a guide and a model for the proposed amendments.[10] The Council adopted the report, and forwarded a petition to the Supreme Court of Virginia, requesting its adoption of the proposed changes in the State Code. The Supreme Court, on April 20, 1976, denied the petition concluding that the proposed amendments would "not serve the best interests of the public or legal profession."

It is the position of the defendants that this Court should abstain from deciding the question of the constitutionality of the state disciplinary provision until the Supreme Court of Virginia has, as they put it, had an opportunity to hear argument on the matter in an adversarial posture. As inviting as the suggestion may be, in the nature of a matter as delicate as the instant one, it is our view that abstention would be inappropriate. Holdings of the Supreme Court of the United States have repeatedly noted that abstention from the exercise of federal jurisdiction is the exception, not the rule.

> 'The doctrine of abstention, under which a district court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the *exceptional circumstances* where the order to the parties to repair to the state court would clearly serve an important

---

7. Rules for the Integration of the Virginia State Bar, Part IV, §§ 5–7, 10, 12, 215 Va. 941–946 (1975).

8. *See generally* "Ethics rules are eased to permit fee listing," 21 *ABA American Bar News,* No. 2, p. 1 (March 1976); "House Broadens Code's 'Publicity General' Rules at Midyear

Meeting in Philadelphia," 62 *A.B.A.J.* 470 (April 1976).

9. *See* Appendix I.

10. *See* Appendix II.

countervailing interest.' *County of Alleghany v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). *'[I]t was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it.' Alabama Public Service Comm'n v. Southern R. Co.,* 341 U.S. 341, 361, 71 S.Ct. 762, 774, 95 L.Ed. 1002 (1951). *Colorado River Water Conservation District et al. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1344, 47 L.Ed.2d 483 (1976). (Emphasis added). *See also Examining Board of Engineers, Architects and Surveyors, et al. v. Flores de Otero et al.,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). Pursuant to this mandate, the Supreme Court has confined the situations in which abstention is justified to three general categories. *Colorado River Water Conservation District et al. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).[11]

 First, this is not a case where there is an ambiguous question of state law, the resolution of which might moot or present in a substantially different posture the federal constitutional issue in controversy. *E.g., Carey v. Sugar,* 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976); *Harris County Commissioners Court et al. v. Moore et al.,*420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975); *Railroad Commissioner of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In the instant case, the disciplinary rule in issue is unambiguous in its prohibition of most advertising by attorneys, and the claim that it violates provisions of the federal constitution is not defeated by the fact that the state courts have concurrent jurisdiction to hear the federal claims or by the fact that the plaintiffs might have sought relief under similar provisions of the state constitution. *See Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Second, this is not a case where the court has been asked to decide issues of state law in an

area where the exercise of federal review would disrupt state efforts to establish a cohesive and coherent administrative policy. *E.g., Louisiana Power and Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). There are no state claims posed in the instant case. Third, this is not a case restraining state criminal proceedings, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), restraining state nuisance proceedings antecedent to a criminal prosecution, *Huffman v. Pursue,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), or restraining the collection of state taxes. *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943).

The defendants contend that the principles of equity, comity, and federalism embodied in the case of *Younger v. Harris, supra,* and its progeny, *Huffman v. Pursue, supra,* should be extended to require the dismissal of the instant case. Those cases are readily distinguishable in that first, the principles of *Younger* have only been applied to on-going state proceedings. The Supreme Court has noted that the "decisions [*Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)] were *premised* on considerations of equity practice and comity in our federal system that have little force in the absence of a pending state proceeding." *Lake Carriers' Assn. et al. v. MacMullan et al.,* 406 U.S. 498, 509, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972). (Emphasis added). *See also Steffel v. Thompson,* 415 U.S. 452, 562, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1973). In the instant case, the plaintiff Consumers Union, on behalf of itself and its members, did all it reasonably could be expected to do in attempting to receive certification for its law directory *before* filing suit. The State Bar had no certification mechanism, and

11. Although none of the abstention categories applied, the Supreme Court held in the case that principles of conservation of judicial resources and comprehensive disposition of litigation may also require one court to defer to the jurisdiction of another. This case does not involve the piecemeal adjudication problems controlling in *Colorado River Water.*

the ABA, for all practical purposes, denied with finality the Consumers Union's request for certification. It was only after this denial that the instant case was filed. The fact that the suit was filed after Ms. Major made her request for an advisory opinion letter, but prior to a final ruling on her request, is not dispositive. Ms. Major is not a plaintiff in the case, nor a member, agent or employee of Consumers Union acting on its behalf. It has never been a requirement of *Younger* that the plaintiff await the resolution of proceedings involving other parties on similar issues before he or she can bring suit in federal court. Second, although the principles of *Younger* have been applied to on-going state administrative proceedings, *American Civil Liberties Union et al. v. Bozardt et al.,* 539 F.2d 340 (4th Cir. 1976), and to on-going state civil proceedings, *Huffman v. Pursue, supra,* their application was conditioned on the fact that the state proceedings were (1) adjudicative and (2) quasi-criminal.

> The component of *Younger* which rests upon the threat to our federal system is thus applicable to a civil proceeding such as this quite as much as it is to a criminal proceeding. *Younger,* however, *also rests upon the traditional reluctance of courts of equity, even within a unitary system, to interfere with a criminal prosecution.* Strictly speaking, this element of *Younger* is not available to mandate federal restraint in civil cases. But whatever may be the weight attached to this factor in civil litigation involving private parties, we deal here with a state proceeding *which in important respects is more akin to a criminal prosecution than are most civil cases.* The State is a party to the Court of Common Pleas proceedings, and the proceedings are both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials.

*Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1974). (Emphasis added). In *Erdmann v. Stevens,* 458 F.2d 1205, 1209 (2d Cir. 1972), the case which the United States Court of Appeals for the Fourth Circuit found controlling in *American Civil Liberties Union et al. v. Bozardt et al., supra,* the United States Court of Appeals for the Second Circuit noted that it was dealing with a disciplinary proceeding that is "comparable to a criminal rather than to a civil proceeding." *See also In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) [disbarment proceedings are "quasi-criminal"]. To further extend the *Younger* principles to non-adjudicative civil proceedings that do not involve or aid any elements of a criminal prosecution can only be done by ignoring the reasoning that gives the principles substance. *See Huffman v. Pursue, Ltd.,* 420 U.S. 592, 613, 95 S.Ct. 1200, 43 L.Ed.2d 482 (Brennan, J., dissenting).

Even if we assume that there was a pertinent on-going proceeding in this case—Ms. Major's request—the proceeding "interrupted" involved only an *advisory* determination by the State Bar. Ms. Major applied for an opinion by the Legal Ethics Committee and appealed to the Council of the State Bar pursuant to Rules of Court, Integration of the Virginia State Bar, Part Six, Section IV, Subsection X:

> 10. Advisory Opinions.—Any active member of the Virginia State Bar may apply to the Council for an advisory opinion on any question of contemplated professional conduct of such member, and upon such application the Council, or committee of the Council appointed for the purpose, shall render such opinion. In the event the opinion is rendered by a committee, such member shall have the right of appeal to the Council.

No appeal from the Council's determination to the Supreme Court of Virginia is provided for in the Rules. Though the State Bar is an arm of the Virginia Supreme Court, *see Goldfarb v. Virginia State Bar et al.,* 421 U.S. 773, 776, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the proceedings in issue were not judicial; they were undertaken in the State Bar's legislative and executive capacity as an overseer of the practice of law in the Commonwealth of Virginia. The Supreme Court has long recognized that not every state Supreme Court function involves ad-

judicative decisions of legal controversies. *E.g., Roudebush v. Hartke,* 405 U.S. 15, 20, 92 S.Ct. 804, 31 L.Ed.2d 1 (1971). The Council's Ethical Opinion No. 180 was exactly what it purported to be, that is, advice given in response to a query from a member of the State Bar. Few would argue that an on-going state legislative determination or that a yet-unresponded-to request for an opinion from the Virginia State Attorney General on the subject matter in controversy would divest a federal court of jurisdiction under *Younger* principles, yet these hypotheses are but a short and natural step from the position taken by defendants in the instant case. The Virginia Supreme Court and its agencies, when acting in their executive and legislative capacity, should be considered accordingly.

 Third, even if it can be said that the principles of *Younger* control the instant case, to now refer the plaintiff back to the state courts by dismissing this action would, in the Court's view, be a gesture of the utmost futility and an unwarranted expenditure of expense and judicial time. The Virginia Supreme Court has made patently clear its view of the disciplinary rule in question. If the plaintiffs are now forced to once again resort to whatever state remedies they may have, the outcome of the state proceedings have been pre-ordained. Further state proceedings are not required when the resolution thereof against the plaintiffs' interest is a foregone conclusion. *See Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *cf. Ham v. North Carolina,* 471 F.2d 406 (4th Cir. 1973); *Perry v. Blackledge,* 453 F.2d 856 (4th Cir. 1971), *aff'd,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *Thomas v. Cunningham,* 313 F.2d 934 (4th Cir. 1963); *Rosebud Sioux Tribe of South Dakota et al. v. Driving Hawk et al.,* 407 F.Supp. 1191 (C.D.S.D.1976), *aff'd* 534 F.2d 98 (8th Cir. 1976).

Finally, we share Circuit Judge Bryan's concern for the propriety of taking any action which could conceivably be interpreted as a lack of respect for the doctrine of comity. The record will reflect, however, that in an attempt to give full force and effect to that doctrine, the Virginia State Bar and the Supreme Court of Virginia were afforded a seasonable opportunity to resolve the issues presented without intrusion by this Court. This case was commenced in February of 1975 and set for hearing seven months thereafter. Even then, we granted defendants a continuance until March, 1976 upon their representation that the matter might be resolved without this Court's intervention. In March of 1976, the matter still remained unresolved, and we thereafter granted a further continuance and waited until the proceedings had run the complete gamut from the American Bar Association to the Virginia State Bar to the Virginia Supreme Court. As we have heretofore noted, when the Virginia State Bar submitted the proposed changes in the rules against advertising to the Virginia Supreme Court, that Court determined that such changes would "not serve the best interests of the public or legal profession."

Comity is not to be equated with faithlessness to our responsibility as we view it. Our brother's adherence to his view of comity is, under such circumstances, we submit, misplaced. While it is factual that the Supreme Court of Virginia's ruling of April 20, 1976 was not rendered in a traditional adversary proceeding, the resolution of the Virginia State Bar was presented to that Court with the Bar's urging of adoption. Any absence of advocacy could not have worked to the Bar's detriment since it was the only party heard by the Virginia Supreme Court. To suggest then that the Court's conclusion was tempered by an absence of advocacy is, in our view, unwarranted. The decision of the Virginia Supreme Court was made in the face of *ex parte* advocacy. Under such circumstances, we fail to see how any further proceeding before that Court could be expected to change the result.

Had we rushed to judgment heedless of the efforts by the Virginia State Bar to modify its ban on lawyer advertising; had we rendered our judgment while the question was pending before the highest court

**516**

of the State of Virginia; had we failed to grant every continuance sought by the defendants in an effort to give full force and effect to the doctrine of comity, then, and only then do we believe that a charge of abrogation of federalism as made by our brother might properly be leveled.

As personally inviting as abstention is to each member of this Court, it is simply not appropriate in the instant case and its adoption would, in our view, be dereliction of our responsibilities.

■ Defendant ABA argues that its conduct as a private party is beyond the reach of 42 U.S.C. § 1983. Both the First Amendment and Section One of the Fourteenth Amendment apply only to governmental activities. *E.g., Civil Rights Cases,* 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Furthermore, § 1983 creates a cause of action for a deprivation of constitutional rights carried out "under color" of state law. *See also United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). [State action standards of the Fourteenth Amendment and § 1983 are identical.] Accordingly, private action, untainted by extensions of state involvement, is immune from the restrictions of these provisions. The question of whether particular conduct is "private" turns on "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). A detailed inquiry of the facts of each case is required to determine whether the test is met, for "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

■ The ABA receives no public funds, nor does it enjoy any special privileges under Virginia law; it is not chartered or licensed by the state; it is not specifically regulated by the state; and, it does not possess any disciplinary powers that can substantially affect one's practice of law in the state. It does, however, through educational programs, counselling and the drafting of model provisions influence the manner in which the State Bar carries out its responsibilities of overseeing the practice of law in Virginia.[12] The counsel gives, and the model provisions it drafts, are not binding on the State Bar, however; the State Bar acts independently of the ABA and may, without incurring any form of retribution, reject its advice.[13] These functions, of educating, counselling, and lobbying, do not, without more, constitute state action within the meaning of the federal provisions pertinent to this case. To otherwise hold would be to label as state agencies all those private organizations involved in successful attempts at influencing government policy-making bodies on the federal, state and local levels; the Constitution does not carry that far. It was held in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 354, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) that regulation by the state does not *per se* make the regulated entity a state instrumentality, and it must be held here that influencing state processes does not *per se* make an influential entity a state instrumentality.

The plaintiffs argue, however, that the ABA's role in certifying law lists and directories for the State Bar has so far insinuated the state into a position of interdependence with the ABA that it and the state must be recognized as joint participants in enforcing the challenged rule. *See Burton v. Wilmington Parking Authority, supra,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Whatever the validity of this position may have been at the time the pleadings were filed, the modification of the

---

12. *See* footnotes 1–3, *supra.*

13. Indeed, the Virginia Supreme Court refused to follow the February, 1976 ABA amendments

to the ABA Code on the disciplinary rules that are the subject matter of the instant case. *See* text accompanying footnotes 8–10, *supra.*

ABA's rule and the refusal of the State Bar to follow suit, has complicated the ABA and the State Bar's relationship. Both the DR 2–102(A)(6) of the State Bar and the ABA contain the following language: "A law list [or any directory in the ABA version] is conclusively established to be reputable if it is certified by the American Bar Association as being in compliance with *its rules and standards.*" (Emphasis added). When the State Bar's and the ABA's rules and standards were identical, these provisions allowed the State Bar to defer to the certification judgments of the ABA. Now, however, the State Bar's standards are significantly more stringent as to what may be published than those of the ABA. Accordingly, a certification by the ABA under its standards no longer carries binding significance with the State Bar. There are only two ways to presently interpret the language of the two rules consistently. First, since the ABA rule has the caveat that its rules are tempered by "the authority having jurisdiction by state law over the subject", the ABA may refuse to certify *any* lists or directories in states that have a conflicting set of standards. The states will have to establish their own certification procedures. Second, the ABA may certify lists or directories according to the state standards if the standards conflict with its own. The states may not have to establish their own procedures under this mechanism. In either case, however, it is the state rules which control—not the ABA rules—and the case must be limited accordingly.[14] Any relief granted in the instant case can be directed only at the enforcement of the state rules. If the second procedure is followed, however, the ABA would, under such circumstances, be an agent of the

State Bar in certifying lists, and, therefore, its certification activities would, in my view, constitute state action. *See United States V. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *Fulton v. Emerson Electric Co.,* 420 F.2d 527 (5th Cir. 1969); *Dreyer v. Jalet,* 349 F.Supp. 452, 464 (S.D. Tex.1971), *aff'd,* 479 F.2d 1044 (5th Cir. 1973). Despite this conclusion, due to the lack of evidence as to the criteria which the ABA may utilize, should the occasion arise, coupled with the fact that it is not a necessary party to effectuate the relief to which plaintiffs are entitled, the ABA will be dismissed.

Turning to the state rule in question, it is the position of the plaintiffs that it violates their rights to receive information and ideas. In *Virginia State Board of Pharmacy et al. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 765, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976), the Supreme Court unequivocally ruled that the right to receive advertising is protected by the First Amendment.

"Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable."

*See also Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Terry*

---

**14.** Plaintiffs argue for a third alternative. The ABA could certify law lists and directories according to its own procedures, and the State Bar could defer to its *refusals,* since a refusal by the ABA will, of necessity in this instance, portend a refusal by the State Bar. This construction would make the ABA's rules self-contradictory and circular. The ABA cannot certify Virginia law lists or directories according to its standards and still have the certification subject to prescriptions by "the authority having jurisdiction by state law over the subject,"

for the Virginia rule has standards that conflict with the ABA rule and, yet, the Virginia rule contains language that conclusively establishes ABA certified lists or directories as reputable under state standards. To avoid the inconsistency, the ABA must refuse to certify Virginia directories or lists, or certify according to state standards. Absent evidence to the contrary, the Court has no choice but to assume that ABA officials will act to comply with feasible interpretations of their rule.

*v. California State Board of Pharmacy*, 395 F.Supp. 94 (N.D.Cal.1975), *aff'd*, 426 U.S. 913, 96 S.Ct. 2617, 49 L.Ed.2d 368 (1976). The Court continues, however, with the caveat that some form of regulation over commercial advertising is permissible. It expressly noted that "[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake. . . . Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem." 425 U.S at 771, 96 S.Ct. at 1830. [Citations omitted].[15]

■ The question in the instant action becomes, then, whether the regulation imposed by the State Bar on legal advertising in the Commonwealth of Virginia is a permissible regulation of commercial speech. Since commercial speech is admittedly protected by the First Amendment, the state carried a heavy burden of justifying incidences of its curtailment. *See Branzburg v. Hayes*, 408 U.S. 665, 680–81, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *Baird v. Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *United Mine Workers of America v. Illinois State Bar Association*, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Brotherhood of Railroad Trainmen v. Virginia*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); *NAACP v. Button*, 371 U.S. 415, 438, 444, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Understandably, defendants are buoyed by footnote 25 in the majority opinion and the concurrence of the Chief Justice.

"We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional services of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising."

425 U.S. at 773, 96 S.Ct. at 1831 n.25 (Emphasis original).

"Attorneys and physicians are engaged *primarily* in providing services in which professional judgment is a large component, a matter very different from the retail sale of labeled drugs already prepared by others. . . . I think it important to note also that the advertisement of professional services carries with it quite different risks than the advertisement of standard products. . . . I doubt that we know enough about evaluating the quality of medical and legal services to know which claims of superiority are 'misleading' and which are justifiable. Nor am I sure that even advertising the price of certain professional services is not inherently misleading, since what the professional must do will vary greatly in individual cases."

425 U.S. at 774–775, 96 S.Ct. at 1832 (Burger, C. J., concurring). It is clear from footnote 25 that the Court was concerned about the possibility of deceptive and misleading attorney advertising, and that the Court is satisfied that appropriate state regulation to prohibit or penalize such advertising may be justified. It would appear also that the Chief Justice is of the view that fee advertising by attorneys may be inherently misleading.

Virginia does have several provisions apart from the disciplinary rule attacked in this case that penalize the publication of false or misleading advertising on legal services. The Commonwealth of Virginia by virtue of § 18.2–216 of the Virginia Code makes it unlawful to advertise services containing "any promise, assertion, representation or statement of facts which is untrue,

---

**15.** The Supreme Court in the *Virginia Board of Pharmacy* case in essence bifurcated the right to freedom of speech. Political speech or ideological expression is to receive radically different constitutional treatment than commercial speech. *See,* 425 U.S. at 775, 96 S.Ct. 1817 (Stewart, J., concurring); 425 U.S. at 771, 96 S.Ct. 1817 fn. 24 (opinion of the Court).

deceptive or misleading"; anyone violating the section is guilty of a misdemeanor. Persons practicing any such deception are subject to sanctions under Virginia civil law, cf., *Old Republic Life Insurance Co. v. Bales*, 213 Va. 771, 195 S.E.2d 854 (Va.1973), and under the Federal Trade Commission Act, 15 U.S.C. 41 *et seq.* The State Bar is charged with the enforcement of disciplinary rule DR 1–102(A)(4)—"A lawyer shall not: Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Violations of the disciplinary rule may be punished with a reprimand, injunctive prohibitions on future conduct, suspension from the practice of law in Virginia, or disbarment from the State Bar. Va.Code Ann. § 54–74; Rules of Court, Integration of the State Bar, Article IV, Section 13(b)–(d), 215 Va. 947–48 (1975). *Cf. Virginia State Bar v. Gunter*, 212 Va. 278, 183 S.E.2d 713 (1971); *Maddy v. First District Committee*, 205 Va. 652, 139 S.E.2d 56 (1954); *Norfolk and Portsmouth Bar Association v. Drewry*, 161 Va. 833, 172 S.E. 282 (1933). It is the position of the defendant that the foregoing provisions, without DR 2–102(A)(6), are inadequate to prevent deceptive legal advertising.

First, since they have to be enforced against individual lawyers *after* the offense, it is the defendants' position that attempts at their effective enforcement would be prohibitively expensive and time-consuming. Speculation and hyperbole are the imaginative foundations of any such contention. It basically assumes that a fairly large contingent of lawyers will not follow the State Code or the state's statutes. There is no evidence in support of such a proposition, and we reject it out of hand as an argument unworthy of more than the regret that the enthusiasm of advocacy has led the defendants to this assumption. Indeed, two expert witnesses have testified that remedies for deceptive or misleading statements by lawyers would be more easily enforced if the statements are made in published form rather than orally in the privacy of an office consultation. Finally, administrative burdens, even if they exist, do not justify the subsistence

of an overbroad statute that violates constitutional rights. *See, e.g., Cleveland Board of Education v. La Fleur*, 414 U.S. 632, 646–47, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Vlandis v. Kline*, 412 U.S. 441, 451, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).

Second, the defendants argue that all legal advertising is (excepting that now permitted) *inherently* deceptive and that the broad prohibitions on publication of consumer information on attorney services contained in DR 2–102(A)(6) are necessary to further the public's interest.

"The traditional bar against advertising by lawyers, which is subject to certain limited exceptions, is rooted in the public interest. Competitive advertising would encourage extravagant, artful, self-laudatory brashness in seeking business and thus could mislead the layman. Furthermore, it would inevitably produce unrealistic expectations in particular cases and bring about distrust of the law and lawyers. Thus, public confidence in our legal system would be impaired by such advertisements of professional services. The attorney-client relationship is personal and unique and should not be established as the result of pressures and deceptions. History has demonstrated that public confidence in the legal system is best preserved by strict, self-imposed controls over, rather than by unlimited, advertising."

Rules of Court, Integration of the State Bar, Article II, Ethical Consideration No. 2–9, 215 Va. 867 (1975). The foundations of the position are disturbing. It assumes either or both of the following two hypotheses. First, it assumes that lawyers will be "extravagant, artful, self-laudatory, and brash" if released from the bonds of the advertising prohibition. If accurate, it is indeed a sad commentary on a profession, which to a large extent, is responsible for and necessary to the functioning of our legal system. Fortunately, however, there is no evidence to suggest that lawyers will behave in an irresponsible manner if the advertising restrictions are removed. In-

deed, in light of past experience, there is strong support for the proposition that most lawyers will behave as they always have, as members of a profession that have taken and follow a solemn oath to uphold the integrity and honor of their profession and our legal system. Second, and perhaps even more disheartening, is the assumption that if any lawyer advertising is permitted, the public will not be able to accurately evaluate its content, for either they are intellectually incapable of understanding the complexities of legal services or they will fall prey to every huckster with a promise, law license and a law book. The overall quality of services rendered will decline as lawyers compete to attract clients through gimmickry. The hypothesis, fortunately in the view of this Court, is so baseless as to warrant little concern. The respect granted the judgments of our citizenry is the bedrock of our system. Additionally, if consumer judgments prove to be inadequate, it is indeed an argument for providing them with more information, not preempting their judgment.

> "There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them."

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer, supra,* 425 U.S. at 770, 96 S.Ct. at 1829. The proliferation of the "they don't know what is good for them" theory of policy-making should always be suspect; it has served as a justification for racism, sexism, and extreme sectarianism.

We think it important not to lose sight of the nature of the service involved in the instant contest over advertising. Consumers Union seeks to furnish information not on the relative merits of brand name washer and dryer combinations but on the availability of legal services, the provision of which has fundamental First, Sixth and Fourteenth Amendment overtones. The Supreme Court has consistently recognized and emphasized the importance of the equal availability of legal services to those that need or seek them. *E.g., United Transportation Union v. State Bar of Michigan,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *United Mine Workers of America v. Illinois State Bar Association,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). Testimony produced in the instant litigation indicates that laymen ignorance about legal services affects their ability and desire to use the judicial process in furtherance of their legal rights. The ABA conducted a comprehensive study of the needs of the public for access to and information about legal services, and found a large incidence among members of the public of legal problems requiring the services of a lawyer coupled with a striking degree of non-use of lawyers by the public. Curran and Spalding, *The Legal Needs of the Public* (1974). Of the respondents to the survey, a large portion, 79.2%, concurred with the following statement (48.3% agreeing "strongly"):

> "A lot of people do not go to lawyers because they have no way of knowing which lawyer is competent to handle their particular problem."

*Id.* at 95. *See also* Frierson, "Legal Advertising," 2 *Barrister* 7 (Winter 1975); Note, "Advertising, Solicitation and the Availability of Legal Counsel," 81 Yale Law Journal 1181, 1204 (1972). The data in these studies can lead only to the conclusion that the legal profession has substantially failed to "educate laymen to recognize their legal problems, to facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available." Rules of Court, Integration of the State Bar, Article II, Ethical Consideration No. 2–1, 215 Va. 865 (1975). Furthermore, the uncontroverted testimony in the instant case, is that the disciplinary rule in issue, by prohibiting the dissemination to law lists of information potentially useful to lay persons, has greatly burdened access to legal services, particularly for the poorer and less sophisticated persons. The rule compels the consumer to obtain authoritative informa-

tion about individual lawyers through an individual consultation with each lawyer that he or she may consider retaining.

The importance of transmitting factually accurate information to the public, however, may justify prohibitions on certain types of advertising in the implementation of the general standard of DR 1–102(A)(4), prohibiting deceptive or misleading practices.[16] The implementation of some prohibitions will be obvious—factually incorrect or misleading advertising will not be tolerated—the implementation of others admittedly not so obvious. It is clear from footnote 25 in the *Virginia State Board of Pharmacy* case, *supra*, that the Supreme Court is not of the opinion that *all* lawyer advertising is inherently deceptive, rather only "certain kinds of advertising" may be so; the fact that lawyers render services rather than sell goods affects this differentiation. It follows, therefore, that if the state rule in controversy prohibits types of advertising that are not inherently misleading or deceptive, then the public's right to consumer information is paramount, and the rule must be voided.

> "The Court has repeatedly held that a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms."

*NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1963). *See also Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

With respect to non-fee information—information on professional reputation and expertise—the rule in controversy allows the publication in law lists or legal directories of (1) the names of the attorneys in the firm (2) a statement of "one or more fields of law in which the lawyer or law firm concentrates," a statement of specialization if authorized by DR 2–105(A)(4), and "with their consent, names of clients regularly represented" (3) various bits of information on legal education, general education, scholastic distinctions, legal authorships, professional association activities, public service activities, military service, and dates and places of admission to the bar of state and federal courts, and (4) the names and addresses of references. Since all of those categories of information not expressly mentioned are excluded, lawyers, pursuant to the rule, may not be permitted to publish information on office hours, size of non-professional staff—paralegal and secretaries, positions of responsibility outside of the legal practice in profit and nonprofit institutions, the percentage of time a lawyer or his firm spends handling matters for particular types of clients,[17] and the percentage of time spent by the lawyer or firm handling matters in particular legal fields.[18] Each of these bits of information may aid a client in assessing the parameters of a lawyer's service; conflicts of interest, general or specific, may be ascertained and areas of expertise may be noted. At the very least, it must be concluded that lawyers should be permitted to advertise office hours. The data is straightforward and factual. If it is falsified, appropriate penalties exist and may be invoked to protect the public interest. With the exception of the use of specialization labels,[19] there is very little non-

---

**16.** The Supreme Court expressly noted that the objectivity and hardiness of commercial speech "may . . . make inapplicable the prohibition against prior restraints." 425 U.S. at 772, 96 S.Ct. at 1831, fn. 24.

**17.** *E.g.*, individuals, small businesses, large businesses, unions, *pro bono* clients, government institutions, etc.

**18.** Care must be taken to define and explain the categories. Examples are criminal law,

family law, personal injury law, taxation, and wills, trusts and estates.

**19.** The State Code, with minor exceptions, prohibits a lawyer from declaring publicly that he or she is a specialist. *Rules for the Integration of the Virginia State Bar*, Part II, DR 2–105, 215 Va. 881 (1975). A few states certify specialists in limited areas if the applicant satisfied specified criteria. *See* Note, Legal Specialization and Certification, 61 Va.L.Rev. 434, 450–456 (1975). Since specialization labels imply a certain *level* of expertise in particular legal areas,

522

fee information that can be justifiably prohibited.

The advertising of fee information presents more difficult questions. Fee information on services, as opposed to products or goods, may encompass so many variables as to make accurate comparison between fee statements on specified services literally impossible. For example, the publication of a charge for a "single-family will" would be inherently misleading; as any competent estate lawyer would be quick to point out, every family may have different and unique estate problems that require a specialized instrument. The more complicated the problems, the more time the lawyer must take to prepare the document. Attempts to publish a set cost, or even an average cost would prove to be meaningless and misleading. There are, however, legal services that are, in the author's view, sufficiently standardized to permit accurate characterizations in a directory. An initial consultation, an ordinary residential real estate conveyance, an uncontested divorce, a standard lease and a change of name proceeding are examples which quickly come to mind, and all of the problems presented therein can be handled by an attorney in committing an amount of time and expertise that is not greatly variable from case to case.[20] If the service itself is *adequately specified*, and standardized, a fee statement is not misleading. Indeed, before *Goldfarb v. Virginia State Bar, supra,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), it was common practice for the Bar to circulate minimum fee schedules on specified services; the practice demonstrated that certain services can be identified with enough uniformity between practitioners to allow for the establishment of a fee figure.[21] Furthermore, statements of hour-

ly charges for service, and statements on billing and credit practices cannot be attacked as deceptive; to the contrary, they are eminently informational and readily ascertainable. In conclusion, specified aspects of a lawyer's fee practices would not be inherently deceptive if published; there are aspects of a lawyer's practice that involve tasks that do not significantly vary from lawyer to lawyer, and that may be carefully specified so that cost figures are both factual and meaningful. The Court has an inadequate evidentiary record to individually evaluate lawyer services to ascertain whether such can be published. Judgments such as these should be made by the State Bar in accordance with the guidelines herein suggested. The crucial infirmity of DR 2–106(A)(6) is its overbroad prohibition.

The defendants contend, finally, that both fee and non-fee information, even if permitted to be published, will of necessity be incomplete, and that this incompleteness is inherently deceptive. The argument assumes that the consumer will look exclusively at the published information in deciding which lawyer to select, or that the consumer will not obtain additional and more individualized information through one or more consultations with the lawyers of his or her choice. There is no evidence in the record to support this position. The plaintiffs' witnesses viewed the directory as an introduction, a first step in the consumers' information-gathering process. In any event, the State Bar could, instead of passing a blanket prohibition, require that all directories or law lists publishing attorney information qualify their materials with additional explanation, including a statement stressing the importance of obtaining individualized comment from chosen attorneys on the nature and costs of the services sought.[22]

they are typically and justifiably carefully regulated.

**20.** This list is not intended to be exhaustive.

**21.** In *Goldfarb* a county bar association published a minimum fee schedule suggesting that 1% of the value of the property involved be charged clients who requested a real estate title examination.

**22.** The Consumers Union directory would contain the following proviso:

"No directory can lead you to the 'perfect' attorney, and this one is no exception. But the information contained in this directory—ranging from educational background and practice specialty to office hours and fees—should help you direct your search to attorneys most appropriate for your individual needs."

In conclusion, for the reasons heretofore stated, the Court concludes that the disciplinary rule in issue is overly broad, as it unconstitutionally restricts the rights of the plaintiffs to receive and gather consumer information.

An appropriate order will issue.

## ORDER

It appearing that the opinions of Judges Merhige and Warriner represent the majority judgment of the Court, and that they concur save on the issue of the publication by the plaintiffs of the amount of the fees charged by members of the Bar of Virginia for services, other than an initial consultation fee, it is now

ORDERED that the American Bar Association be, and it is hereby, dismissed.

It is further ADJUDGED and ORDERED that the prayers of the complaint, as amended, as to the State defendants, be, and they are hereby, granted with the exception aforesaid; that accordingly the publication described in the complaint, as amended, and proposed by the plaintiffs be, and it is hereby, declared valid with said exception; and to that extent, and to that extent only, the defendants, their successors in office, their agents and attorneys be, and they are hereby, permanently enjoined and restrained from enforcement of the rules and regulations issued by the said defendants and described in the complaint in respect to advertising by the lawyers practicing in the State of Virginia.

Counsel for the respective parties are directed to meet and confer in an effort to reach an amicable adjustment of the issue of counsel fees. If the parties are unsuccessful in resolving said issue, counsel for the plaintiffs are directed to apply to this Court within thirty (30) days of this date for a day certain for the purpose of all counsel and the resident judges meeting and setting such further schedules as may be requisite.

Let the Clerk send copies of the Memorandum of each member of the Court and this Order to all counsel of record.

ALBERT V. BRYAN, dissents from the foregoing Order.

## APPENDIX I

DR 2–102(A) is amended as follows (additions underlined, deletions bracketed):

(A) A lawyer or law firm shall not use or participate in the use of professional cards, professional announcement cards, office signs, letterheads, telephone directory listings, law lists, legal directory listings, or similar professional notices or devices, except that the following may be used if they are in dignified form:

\* . \* \* \* . \* \*

(5) A listing of the office of a lawyer or law firm in the alphabetical and classified sections of the telephone directory or directories for the geographical area or areas in which the lawyer resides or maintains offices or in which a significant part of his clientele resides and in the city directory of the city in which his or the firm's office is located; but the listing in the alphabetical section may give only the name of the lawyer or law firm, the fact he is a lawyer, addresses, and telephone numbers, and the listing in the classified section must comply with the provisions of DR 2–102(A)(6). The listing shall not be in distinctive form or type. A law firm may have a listing in the firm name separate from that of its members and associates. The listing in the classified section shall not be under a heading or classification other than "Attorneys" or "Lawyers," except that additional headings or classifications descriptive of the types of practice referred to in DR 2–105 are permitted.

(6) A listing in a reputable law list, [or] legal directory, a directory published by a state, county or local bar association, or the classified section of telephone compa-

**524**

ny directories giving brief biographical and other informative data. A law list or any directory is not reputable if its management or contents are likely to be misleading or injurious to the public or to the profession. A law list or any directory is conclusively established to be reputable if it is certified by the American Bar Association as being in compliance with its rules and standards. The published data may include only the following: name, including name of law firm and names of professional associates; addresses and telephone numbers; one or more fields of law in which the lawyer or law firm concentrates[;], a statement that practice is limited to one or more fields of law[;], or a statement that the lawyer or law firm specializes in a particular field of law or law practice, to the extent permitted by the authority having jurisdiction under state law over the subject and in accordance with rules prescribed by that authority; [but only if authorized under DR 2–105(A)(4)] date and place of birth; date and place of admission to the bar of state and federal courts; schools attended, with dates of graduation, degrees, and other scholastic distinctions; public or quasi-public offices; military service; posts of honor; legal authorships; legal teaching positions; memberships, offices, committee assignments, and section memberships in bar associations; memberships and offices in legal fraternities and legal societies; technical and professional licenses; memberships in scientific, technical and professional associations and societies; foreign language ability; names and addresses of references, and, with their consent, names of clients regularly represented; whether credit cards or other credit arrangements are accepted; office and other hours of availability; a statement of legal fees for an initial consultation or the availability upon request of a written schedule of fees or an estimate of the fee to be charged for the specific services; provided, all such published data shall be disseminated only to the extent and in such format and language uniformly applicable to all lawyers, as prescribed by the authority having jurisdiction by state law over the subject.

## APPENDIX II

Examination and comparison of the two documents [the State Code proposed amendments and the ABA Code] will disclose the following changes made by this committee to the amendments as adopted by the House of Delegates of the ABA:

*A.* On Page 3 of the amendments adopted by the ABA, the language "to the extent permitted by the authority having jurisdiction under state law over the subject and in accordance with rules prescribed by that authority" was deleted and the following language was substituted for it: "to the extent permitted and in accordance with rules prescribed by the Supreme Court of Virginia."

*B.* On the same page the language "whether credit cards or other credit arrangements are accepted" was deleted and the following language was substituted for it: "whether credit arrangements are accepted."

\* \* \* \* \* \*

*C.* At the top of Page 4 of the amendments adopted by the ABA, the language "a statement of legal fees for an initial consultation or the availability upon request of a written schedule of fees or an estimate of the fee to be charged for the specific services" was deleted and the following language was substituted for it: "a statement of legal fees, if any, for an initial consultation and the availability upon request after consultation of an estimate of the fee to be charged for the specific services."

\* \* \* \* \* \*

*D.* All the remaining language of the amendments to the Code adopted by the House of Delegates of the ABA was deleted.

*Report of Special Committee on Advertising, Virginia State Bar*, pp. 1–2 (April 1, 1976).

WARRINER, District Judge (concurring in part, dissenting in part).

## I

■ With reluctance I concur with the opinion of the Court with respect to the advertising of non-fee information. Such concurrence is to be read strictly within the confines of the case presented. Insofar as the opinion speaks to the advertising of fee information, except for the fee for an initial consultation as hereinafter noted, I dissent.

I reiterate: For what I consider to be sound policy reasons I strongly deplore advertising by lawyers. But policy alone cannot, under our system of government, erode rights guaranteed by our Constitution. I am satisfied that the law requires what this Court has decided as to the right of plaintiffs to receive and gather non-fee consumer information about lawyers. So, policy considerations notwithstanding, judicial inquiry ends here on that issue. As a practical matter, I think it better for lawyers to avoid the pitfalls of advertising by avoiding advertising altogether. But mine is not the province of setting policy. The question presented involves plaintiff's rights under the Constitution and I cannot dispute the correctness of the law as expounded by Judge Merhige with respect to non-fee advertising under the facts presented in this case.

## II

However, I believe there are more than policy considerations at issue with regard to the advertising of lawyers' fees. Indeed, what the law is on this point was left an open question by the Supreme Court in *Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In that case the Appellees, as consumers of prescription drugs, brought suit against the Virginia State Board of Pharmacy challenging the validity under the First and the Fourteenth Amendments of the Virginia statute declaring it to be unprofessional conduct for a licensed pharmacist to advertise the prices of prescription drugs.

The Court first considered whether or not "commercial speech" was wholly excluded from First Amendment protection and decided that it was not. 425 U.S. at 761, 96 S.Ct. 1817. The Court nevertheless cautioned in a footnote that "in concluding that commercial speech enjoys First Amendment protection, we have not held that it is wholly undifferentiable from other forms" 425 U.S. at 771, 96 S.Ct. at 1830, note 24. The Court explicated upon the difference as follows:

> There are common sense differences between speech that does 'no more than propose a commercial transaction' and other varieties. Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. . . .
>
> Attributes such as . . . the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker. They may also make it appropriate that a commercial message appear *in such a form*, or include such additional information, warnings and disclaimers, as are necessary to prevent its being deceptive. ('It is not difficult to choose statements, designs and devices which will not deceive.') They may also make inapplicable the prohibition against price restraints. [Citations omitted] [Emphasis added] 425 U.S. at 771–772, 96 S.Ct. at 1830, note 24.

In concluding the opinion, the Court further noted that:

> Some forms of commercial speech regulation are surely permissible. We mention a few only to make clear that they are not before us and therefore are not foreclosed by this case.
>
> There is no claim, for example, that the prohibition on prescription drug price advertising is a mere time, place, and manner restriction. We have often approved

526

restrictions of that kind provided they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information. Whatever may be the proper bounds of time, place, and manner restrictions on commercial speech, they are plainly exceeded by this Virginia statute, which singles out speech of a particular content and seeks to prevent its dissemination completely.

Nor is there any claim that prescription drug price advertisements are forbidden because they are false or misleading in any way. Untruthful speech, commercial or otherwise, has never been protected for its own sake. Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive and misleading. We foresee no obstacle to a State's dealing effectively with this problem. 425 U.S. at 770–771, 96 S.Ct. at 1830.

The Supreme Court in the *Pharmacy* case has further eroded the distinction between commercial and non-commercial speech but has not obliterated it. Nor has it fashioned a comprehensive test to determine the extent of First Amendment protection afforded speech which is either purely commercial or has commercial aspects. The Court did cite examples as to the permissible scope of regulation in this area which I frankly find difficult to reconcile.

The Court, in dicta, recognized the propriety of restrictions as to time, manner and place which serve a legitimate State inter-

est and leave ample opportunity for alternative communication of the information *if* said restrictions are justified "without reference to the content of regulated speech." In footnote 24 the Court states that it is appropriate to require that a commercial message appear in such a form, or include such additional information, warnings or disclaimers as are necessary to prevent its being deceptive.

Since the regulation of speech to rectify its deceptive nature *necessitates* reference to the content of that speech, I find this an irresolvable conflict in the *Pharmacy* case. Notwithstanding the apparent inconsistency, I believe the Supreme Court acknowledged the constitutional soundness of regulating speech, commercial or otherwise, to prevent confusion or deception where regulation is the only feasible means of preventing the same, where the consequence to the public of failure to do so is severe and where alternative avenues of communication are not totally precluded. The Court specifically stated that it foresaw no problem with States "dealing effectively" with deceptive or misleading commercial speech.[1] This must mean reasonable regulations as to time, manner and place are deemed constitutionally permissible even though there be reference to content when such reference is for the sole purpose of eliminating confusing or misleading speech communicated in what may be considered a commercial context.

The Court's closing footnote leaves this door open with respect to the advertising of attorneys' fees:

1. Although not exactly on point, the Court cited *Gertz v. Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) for the proposition that untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz* at page 340, 94 S.Ct. at page 3007 states:

[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a

step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' [citations omitted]

Like false statements, misleading and confusing speech is of doubtful social value and in commercial context may be a severe detriment, perhaps not, at least in the short run, to order but certainly to morality and to health and welfare as well. Such speech should be weighed accordingly when balanced against these legitimate State interests in determining the extent of protection afforded by the First Amendment.

We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional services of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising. 425 U.S. 773, 96 S.Ct. 1831.

Nevertheless, the Court in *Pharmacy* used strong language to indicate from a constitutional standpoint its clear disapproval of the advertising ban on fees relating to prescription drugs.[2] Hence significant distinctions must be shown to justify a different conclusion as to the advertising of attorneys fees. I believe those distinctions are present.

Chief Justice Burger, concurring in *Pharmacy*, highlighted some of the more important distinctions:

The Court notes that roughly 95% of all prescriptions are filled with dosage units already prepared by the manufacturer and sold to the pharmacy in that form. These are the drugs that have a market large enough to make their preparation profitable to the manufacturer; for the same reason, they are the drugs that it is profitable for the pharmacist to advertise. In dispensing these items, the pharmacist performs three tasks: he finds the correct bottle; he counts out the correct number of tablets or measures the right amount of liquid and he accurately transfers the doctor's dosage instructions to the container. Without minimizing the potential consequences of error in performing these tasks or the importance of other tasks a professional pharmacist performs, it is clear that in this regard he no more renders a true professional service than a clerk who sells lawbooks.

Our decision today deals largely with the States' power to prohibit pharmacists from advertising the retail price of prepackaged drugs. As the Court notes, . . . quite different factors would govern were we faced with a law regulating or even prohibiting advertising by the traditional learned professions of medicine and law. The interest of the State in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts' . . . . Attorneys . . . are engaged *primarily* in providing services in which professional judgment is a large component, a matter very different from a retail sale of labeled drugs already prepared by others. . . .

I doubt that we know enough about evaluating the quality of . . . legal services to know which claims of superiority are justifiable. Nor am I sure that even advertising the price of certain professional services is not inherently misleading since what the professional must do will vary greatly in individual cases. It is important to note that the Court wisely leaves these issues to another day. 425 U.S. at 773–775, 96 S.Ct. at 1831–1832.

III

I am of the opinion that Chief Justice Burger touched the crucial distinction in his suggestion that advertising the price of the professional services of an attorney might be inherently misleading. While there may possibly be rare exceptions, I believe the advertising of a fee for any legal service other than for an initial consultation of a specified length is inherently misleading and thus, far from being helpful, is harmful. No matter what the service, there are entirely too many circumstances which will alter the fee appropriate to be charged.

**2.** . . . [T]he justifications Virginia has offered for suppressing the flow of prescription drug price information, far from persuading us that the flow is not protected by the First Amendment, have reinforced our view that it is. 425 U.S. at 770, 96 S.Ct. at 1830.

It is true that a standard residential deed ought to cost about $20. It is not true, however, that the client shopping for a lawyer on the basis of his fee necessarily knows what a "standard residential deed" is. Further, a lawyer doesn't know, in advertising his fee, whether the client will furnish the lawyer with the old deed so he can sit at his desk and dictate the new deed, or whether the client is simply going to tell him that it was the house he inherited from his Uncle Josh Johnson who died in 1937—necessitating the lawyer going to the clerk's office to get the description and derivation of title. There should be a difference in the fee charged in the two instances and yet the product in each case is nothing but a "standard residential deed." I have drawn deeds where working out the derivation of title has taken hours. I added a surcharge for the time. Yet the product was a standard residential deed.

Even when a lawyer painstakingly explains to a client the variables that will be considered in arriving at a fee but nevertheless gives him an approximation of what the lawyer thinks the fee will be, the thing the client remembers is the figure mentioned. The client generally does not remember that the lawyer told him that it was an approximation and that he told him that the variables might increase the fee substantially. How much more will the client be misled and become distrustful of the law and lawyers when the lawyer charges more for his service than he advertised in black and white.

If one can casually conjure up examples where the standard residential deed can't be standardized, how much more troublesome is the problem in the areas of uncontested divorce, change of name, uncontested adoption and the like? In my experience there simply isn't any such thing as a "standard" service. Even after a lawyer has heard a client's explanation of the service desired, most lawyers are hesitant in quoting a flat fee. Most prefer to quote a

range within which the fee is likely to fall. They do this not to be obscure or to mislead, but because experience has taught them that *only* when you have performed the service can you know for sure what it is worth.

As I hope the foregoing paragraphs have illustrated, deception and confusion is the nature of the beast in fee advertising and the beast will show its horns despite the utmost good faith. I know the overwhelming majority of lawyers would undertake to advertise fees fairly and accurately. Indeed, there exists an enforceable prohibition against lawyers who engage in "dishonesty, fraud, deceit, or misrepresentation" [3] in advertising or otherwise. But this prohibition is not appropriate to overcome the evil in fee advertising, which is *inherently* misleading. If, as I believe, all fee advertising is misleading despite the good faith of the lawyer-advertiser, then the Code would prohibit all fee advertising. This merry-go-round starts nowhere and ends nowhere.

The Holmesion prohibition on shouting "Fire!" in a crowded theater is familiar to us all. One would not remove that prohibition upon passage of an ordinance making it a crime to precipitate a panic which causes injury. The shouting of "Fire!" is inherently and dangerously misleading and the good sense and judgment of mankind prohibits it without waiting to count the bodies at the exit doors.

Nor is the fee advertisement bar premised on any lack of confidence in the ability of the Bar to enforce the provisions of DR 2–101.[4] The problem lies in the paradox of permitting a practice that is prohibited; that is, permitting fee advertisement, an inherently misleading activity, and at the same time, directing the Bar to enforce its bar against deceiving the public. This is the same as granting permission to the proverbial request to go swimming. "Yes, my darling daughter . . . but don't go near the water."

3. Va.Code of Prof.Resp. II, DR 1–102(A)(4); *see also*, Va.Code Ann. § 54–73 (1974).

4. See n. 3, *supra*.

## IV

Clearly the factual distinctions between the issue at hand and that in *Pharmacy* are significant, but I have yet to show precisely how and why these factual distinctions require a legal conclusion different from that in *Pharmacy*.

To begin with, there is no dispute that the right to know has equal footing with the right to speak under the First Amendment. *See Red Lion Broadcasting Co. v. F. C. C.*, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Nor is there any doubt that the State has a legitimate and substantial interest in regulating the conduct of lawyers to prevent deception in the practice of law. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. at 773, 96 S.Ct. 1817, note 25.

The consumers' right to know and the State's substantial interest in protecting its citizens from deceptive legal practices are in conflict. The Supreme Court in *Pharmacy* and in other recent cases close on point has used, though not labeled as such, a balancing approach to resolve the conflict. *See e. g., Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). *See also* Comment, *Advertising of Professional Fees: Does the Consumer Have a Right to Know*, 21 S.D.L.Rev. 310 (1976). The problem is that the Court has not, except in a general and incidental manner, explicated upon what factors to consider and what weight to apply to the various considerations. I am left to my own devices.

I believe that DR 2–101, insofar as it regulates the advertising of fees, is a time, manner and place restriction. Accordingly, the balancing process should focus on the reasonableness of the restrictions in this context. I gleaned earlier from *Pharmacy* that prohibiting advertising of lawyers' fees (other than an initial consultation) in order to prevent confusion and deception would be constitutionally permissible provided, (1) the regulation is the only feasible means of preventing the confusion or deception, (2) the consequence to the public of failure to so regulate would be severe, (3) alternative areas of communication of the desired information are not totally precluded, and (4), in addition to the above, the regulation is reasonable or justifiable in light of First Amendment considerations.

I have already presented the factual basis for assuming that advertising of attorneys' fees is inherently confusing and deceptive and for assuming that the prohibition imposed by DR 2–101 is the only feasible means of avoiding the same. No one would seriously dispute the severity of the consequence of deceptive practices by lawyers so I will not deal with this point further. This leaves open the questions of alternative avenues for communicating the desired information and of the reasonableness of the regulation in a First Amendment context, which is where I opine the balancing comes into play.

With respect to alternative avenues of disseminating the desired information we must remember that "advertising" as it is commonly understood is not itself speech but a manner in which speech may be communicated. Restricting that manner of communication totally may indeed severely hamper the flow of information but it is not equivalent to total prohibition of speech. It is important not to lose sight of this distinction.

I am aware the Supreme Court has observed that "in a society in which each individual has but limited time and resources . . . he relies necessarily upon the press to bring him in convenient form the facts." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975). However, when weighed against the harm of deception and confusion with respect to information about legal services, mere convenience has to take a second seat.

Surely the wisest approach concerning dissemination of information about legal fees is for the prospective client to talk to the lawyer in person. Only then can the inevitable peculiarities of the client's particular legal problem be given proper consideration in estimating appropriate fees.

In *Pharmacy* the Court seemingly concluded that no viable alternative avenues of informing the public of the price of prescription drugs was left open by the Virginia statute in question:

> Whatever may be the proper bounds of time, place, and manner restrictions on commercial speech, they are plainly exceeded by the Virginia statute, which singles out speech of a particular content and seeks to prevent its dissemination *completely*. [Emphasis added] 425 U.S. at 771, 96 S.Ct. at 1830.

As has been pointed out, unlike prescription drugs, there are in truth no standard fees for legal services. Prohibiting the printing of what purports to be standard fees cannot be said to prohibit the flow of information because, having read the ad, the reader in actuality remains uninformed as to what he thought he was learning. More regrettably, he is now also misinformed and may act on the basis of misinformation as he otherwise would not have acted.

Additionally, there is a distinction between the Virginia statute questioned in *Pharmacy* and DR 2–101 which may explain why the Supreme Court found that price information in that case was completely prevented from dissemination and why I find that DR 2–101 does not accomplish the same with regard to lawyers' fees. The Virginia statute in pertinent part reads:

> Any pharmacist shall be considered guilty of unprofessional conduct who . . . publishes, advertises or promotes, directly or indirectly, in any manner whatsoever, any amount, price, fee, premium, discount, rebate or credit terms for professional services or for drugs containing narcotics or for any drugs which may be dispensed only by prescription. Va.Code Ann. § 54–524.35 (1974).

DR 2–101 on the other hand is silent on the issue of advertising attorneys' fees. The restriction is by implication and is of a substantially different nature than the restriction in the above statute:

> (B) A lawyer shall not publicize himself, his partner, or associate as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in city or telephone directories, or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf except as permitted under DR 2–103. This does not prohibit limited and dignified identification of a lawyer as a lawyer as well as by name . . . .

The advertising of lawyers' or law firms' fees for legal services is not listed in DR 2–103 and thus is not permitted. Unlike the Virginia statute which precludes advertisement of prescription drug prices "in any manner whatsoever" whether "directly or indirectly," I read DR 2–101 as prohibiting the advertisement of fees only if they are published in connection with a particular lawyer or law firm. There is no prohibition, for instance, against a group, such as Consumer Union, gathering average estimates of fees that lawyers charge for various legal services and publishing the same absent representations as to what an individual lawyer or law firm will charge for specified services. In this way consumers could have *general* guidelines as to what lawyers on the average wind up charging for various legal services without being misled into thinking that if they go to a certain lawyer they will get a certain price for a certain service. Even such a publication must be encompassed about with caveats and disclaimers.

Third, and most importantly, the most viable avenue of communication concerning fee information left open by DR 2–101 is face to face consultation with lawyers. Any legal problem worth seeing a lawyer about is worth inquiring in person as to the charge, among other things, before choosing a lawyer.

Lastly, and apart, from the above considerations, I must determine whether or not the Rule's restriction on advertising attorneys' fees is reasonable in light of the First Amendment. In balancing what I consider to be the relevant factors it comes to mind

that the State has a strong legal and historical role in closely policing its lawyers; that commercial speech is still not on an equal footing with other areas of speech; and that inherently confusing and misleading speech has shallow, if any, social value and can cause great harm, particularly in the circumstance at issue. Drawing from my personal experience as a lawyer for many years, I am convinced that the harm to the legal profession and to the public at large may be irreparable.

On the other side, I must contend with what was said in *Pharmacy*. The Court said that the State's protectiveness of its citizens rests in large part on the supposed advantages of their being kept ignorant. This consideration weighs little herein where, as distinguished from *Pharmacy*, I find the mode of communicating the information proscribed renders it inherently misleading. If someone seeking certain information is given false or misleading information he is in more of a state of ignorance than before. *Pharmacy* also stated that the ban on advertising questioned therein did not directly affect professional standards one way or the other. There the professional conduct amounted to the selling of a product. But where a truly professional service is being rendered the quality thereof will have to suffer when the price through advertising is driven below a certain margin. And, unlike the substitution of ingredients in a drug, the shoddy will be difficult to ferret out.

*Pharmacy* also complains of insulation from competition caused by the ban in that case. Where the products in question are virtually identical the point is well taken. The competitive variable is the cost. But where the product is an intricate and complicated professional service, allowing price advertising destroys the more important existing competition of quality without substituting a fair alternative measure with which to choose a lawyer.

Finally, *Pharmacy* states with reference to the drug price ban that there is "an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open up the channels rather than to close them." 425 U.S. at 770, 96 S.Ct. at 1829.

Again, I agree with the logic in *Pharmacy* as it applies to that case. To be sure, this judge does not favor a paternalistic approach to dealing with problems concerning the citizenry. But I cannot assume in this case, as was rightfully assumed in *Pharmacy*, that advertised lawyers' fees are not in themselves harmful. Because the information is inherently misleading it is in itself harmful and very harmful indeed as has been explained. It is not being paternalistic to recognize that a layman will not understand the numerous variables that will usually cause fees to be substantially different from what the advertisement that lured him to the attorney's office promised. A lawyer has experienced three years in law school and some years of practice to learn with some degree of reasonableness how to determine fees. Lawyers know they cannot price services fairly and reasonably without reference to a specific set of facts. Even then, setting a fee is one of the more difficult tasks of a lawyer. Under the circumstance I do not think that the ban in question is paternalistic. It is, instead, realistic.

On balance, I find that the Rule as it concerns the advertising of attorneys' fees is a reasonable regulation as to time, manner and place and as such is not violative of the First Amendment.

I cannot concur with that portion of the opinion which permits advertising for any service other than for an initial consultation of a specified length of time. The advertisement might add that approximations of the fee to be charged for requested services could be given at the initial consultation.

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

I would dismiss. This is an action immediately and squarely against the Supreme

Court of Virginia and its organs. In the circumstances here, *comity* requires this court to order dismissal.[1] That disposition will be without prejudice to the pursuit in the Supreme Court of Virginia by the plaintiffs of their claims with opportunity to appeal to the Supreme Court of the United States.[2] Incidentally, in my view abstention is not the remedy for ruptured comity.

Throughout it must be remembered that this is not a suit against a State administrative agency action. *Erdmann v. Stevens, post,* 458 F.2d 1205, 1208 (2 Cir. 1972). It is against the highest court of Virginia, a part of the State's separate judicial department, a coordinate of the separate Federal judicial department. The State Bar and its Committee and the Supreme Court of Virginia are of one; the former are operating instruments of the Court. They carry its burden of policing the profession. The Bar's character and status in this regard are delineated with particularity and present apposition in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), *passim,* expositing how the Court speaks through the Bar and, in turn, the Bar for the Court. Certainly, one of the foundations of federalism is the teaching that the judiciaries of the two sovereign governments should not collide head on or be pitted one against the other when, as here, a citizen's rights and privileges under the Constitution of the United States can otherwise be safeguarded without loss of Federal watchfulness.

True, a Federal court must not abdicate its jurisdiction to protect a citizen merely because there is recourse and remedy available in the State court. But presently there is no shirking of duty. Federal jurisdiction is deferred only temporarily and in sight is an appeal to the United States Supreme Court as a matter of right. 28 U.S.C. 1257(2); *see Huffman v. Pursue, Ltd., post,* 420 U.S. 592, 605, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Since there is no "showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief", *Younger v. Harris, post,* 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1971), comity is the *felicitous* solution and is dictated by the authorities.

The admonition of *Younger v. Harris, supra,* at 44, 91 S.Ct. at 750, although referring to a criminal case, well summarizes the theorem of this dissent:

> "This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an *even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions,* a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism,' . . .. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always *endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.*"
> (Accent added and citations omitted.)

In *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 603, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482

---

1. True, the American Bar Association is also a party defendant but admittedly it does not assert any direct disciplinary powers over the Virginia lawyers; its only possible sanctions against them is whatever restraint its professional reproval might impose; and a decision on the State Bar Code alone would in reality be an adjudication of the case against the ABA, even in view of the recent relaxation of the ABA Code.

2. The Supreme Court of Virginia has expressed its willingness to accept this case and has on two previous occasions accepted petitions of this nature: *Application of Titus,* 213 Va. 289, 191 S.E.2d 798 (1972); *Application of Brown,* 213 Va. 282, 191 S.E.2d 812 (1972); *see Brown v. Supreme Court of Virginia,* 359 F.Supp. 549 (E.D.Va.1973).

(1975), the *Younger* policy was adapted to civil causes and this reminding statement is now insistently apt:

"The seriousness of federal judicial interference with state civil functions has long been recognized by this Court. We have consistently required that when federal courts are confronted with requests for such relief, they should *abide by standards of restraint that go well beyond those of private equity jurisprudence.* . . ." (Accent added.)

With like vehemence inveighing against Federal occupation of a State court realm, and with strikingly similar features to the instant litigation, is *Erdmann v. Stevens, supra,* 458 F.2d 1205 (2 Cir.), *cert. denied,* 409 U.S. 889, 93 S.Ct. 126, 34 L.Ed.2d 147 (1972). There an action was brought in the Federal District Court against the judges of the Appellate Division, First Department, State of New York, for a declaration and injunction against disciplinary measures taken by them and asserted to be in violation of the plaintiff's constitutional rights. The trial court dismissed for lack of jurisdiction, but the Court of Appeals affirmed the dismissal for complainant's "*failure to state facts entitling him to federal intervention*". Like the instant plaintiffs, he had shown no "extraordinary circumstances of bad faith or harassment." The opinion of the Court speaks forthrightly to the importance of sticking to the *Younger* pronouncement:

"Thus, . . . we see no sound reason for exempting a pending state court disciplinary proceeding from the principles of federal-state comity underlying *Younger* and its companion cases. The issue before us is not merely the constitutionality of a state court's action in a suit between third parties but its application of standards established by it for observance by its own officers. Although a court may neither act arbitrarily with respect to those licensed by it nor otherwise violate their constitutional rights, . . . state courts have traditionally been allowed wide discretion in the establishment and application of standards of professional conduct and moral character

to be observed by their court officers. . . . ."

My thesis is not a disclaimer or disavowal of *jurisdiction.* Even though the power to decide is in this court, because of considerations of comity we do not have the "right" at this stage of the litigation. *Erdmann* made this distinction. *Id.* at 1212.

Quite recently this Circuit has given heartening spirit to this philosophy. In *American Civil Liberties Union v. Bozardt,* 539 F.2d 340 (4 Cir. 1976), that Court held that the agenda and acts of the Board of Commissioners on Grievances and Discipline of the South Carolina Bar were intramural the Supreme Court of the State. I have just now said so, in characterizing the grist and grindings of the Virginia State Bar. *Erdmann* was of the same mind in regard to discipline in New York. *Id.* at 1208, quoted *supra.* Further, in *Bozardt,* Judge Boreman said for the Court:

". . . [P]rinciples of *comity* and *federalism* require that the federal courts not be permitted to interfere in . . . ongoing state proceedings." (Accent added.)

He maintained, too, that the patterns of *Younger* and *Erdmann* should be imitated by dismissing rather than abstaining. *Cf. Gibson v. Berryhill,* 411 U.S. 564, 580, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

The mention of "ongoing proceedings" has given rise to argument that the present controversy does not fit the pigeonhole of *Younger* and its species, because in this suit there is no counterpart of separate proceedings. But the fact that I do not rely upon the narrow holding in the *Younger* line of cases does not infirm the soundness of my conclusion. Comity is the veritable touchstone of *Younger, Huffman, Erdmann* and *Bozardt* and it is to be heeded now because the present facts proclaim an even more intimate confrontation of State judiciary by the Federal—a violent abrogation of federalism.

This action should be dismissed with costs.